IN RE GUARDIANSHIP OF FRED M. DEUTSCH ET AL., MINORS. W. F. MORAN, GUARDIAN, APPELLEE, V. FRED M. DEUTSCH ET AL., WARDS, APPELLANTS.

FILED MARCH 7, 1928. No. 25187.

*Charles H. Kelsey* and *J. J. Ledwith*, for appellants.

*Harry S. Dungan, D. W. Livingston,* and *W. F. Moran,* contra.

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, THOMP-SON, and HOWELL, JJ., and REDICK, District Judge.

REDICK, District Judge.

Appeal from the district court upon final settlement of a guardian's account. In March, 1916, Mary Deutsch died, leaving as her heirs three sons, Fred, aged 17 years, Al, 15 years, and Eugene, 13 years. May 10. 1916, W. F. Moran, appellee, a maternal uncle, was appointed guardian of the minors, and filed his final report September 27, 1922, which, upon a spirited contest, was finally approved by the county court except as to certain matters. The report of the guardian showed the wards indebted to him as follows: Fred, $1,390.29, Al, $2,364.82, and Eugene, $969.01, but the county court charged the guardian the sum of $13,292.45, of which $12,706 represented the value of certain real estate, title to which the guardian had taken in his own name, and the remainder, $586.45, representing certain rents which the guardian should have received. Deducting the total claims of the guardian, $4,723.95, from the above amount left $8,568.50 found due from the guardian to the minors, distributed as follows: Fred, $3,040.69, Al, $2,066, and Eugene, $3,461.81. The guardian appealed to the district court, and after a lengthy trial a decree was entered finding the wards indebted to the guardian as follows: Fred, $1,390.29, Al, $2,364.82, and Eugene, $969.01, being substantially the amount claimed by the guardian in his final report, and allowed the guardian $1,500 for his services. The wards appeal alleging three errors: (1) In not charging the guardian with the value of the real estate, title to which was taken in his own name; (2) in approving the final report of the guardian as filed in the county court, and (3) in allowing the $1,500 compensation to the guardian.

The record is very voluminous, consisting of over 700 pages with 99 exhibits, and we consider it not only impracticable but unnecessary to set forth in this opinion the evidence in detail, but must content ourselves with a somewhat general statement of the facts as shown by the record and our conclusions therefrom.

We address ourselves to the first assignment, that the

district court erred in not charging the guardian with the value of the real estate taken in his name. The wards claim that by so doing the guardian converted the property and that they are entitled to charge him with its value. The guardian claims that the title was so taken merely for convenience in disposing of the same; that he holds said title in trust for the wards, and tendered conveyance thereof in the district court. The facts giving rise to this dispute are as follows: The guardian's reports all show an indebtedness of the wards to him, and the one of June 15, 1919, exhibited an indebtedness of $5,285.57. This amount was later reduced by corrections in subsequent reports, but in July, 1919, the guardian filed an application in the district court of Adams county for license to sell real estate to pay debts, and license was granted October 11, 1919, to sell, *inter alia,* block 7, Mumaw's addition to Hastings, being the home place where the mother of the wards died, and 18 vacant lots in Frances addition to Hastings. License having been granted, the two properties in question were advertised for sale on June 18, 1920. The guardian and Fred were present at the sale, with others, but no bids were made. The guardian suggested to Fred that he buy the property in so as to avoid the expense and loss of time consequent upon a second offering, and to facilitate a disposal of the property by a private sale. To this Fred agreed, and became the purchaser of the home place at $5,000 and the lots at $3,600. No money was paid, it being the understanding that Fred should hold the title in trust for himself and brothers. The sale was confirmed and the guardian executed a deed to Fred. July 13, 1920, Moran wrote Fred:

"Dear Nephew: Enclosed find three deeds to the property in Hastings. I have not heard from Cunningham since I was out there, but I want to be in a position to turn the deed over to them just as quick as the judge confirms the sale. I have every real estate man in Hastings working on the balance of the property and I want to be in a position to hand them the deed as soon as sales

can be made. Therefore, please go before some notary public and sign and acknowledge deeds and return them to me and I will fill in the consideration and the name of the party when the land is sold."

July 21, 1920, Fred replied:

"Dear Uncle: Your letter of July 13th, in regard to signing the blank deeds, which you enclosed, to the home and five acres, the bunch of lots and the lots Cunningham intends to buy, was received some time ago, but I could not get trace of a notary and therefore had to wait until I got to Alliance.

"I believe keeping the deeds in readiness is the best way to cinch a deal if any buyer should come along, as persons buying such property change their minds with the wind.

"I believe the lots should sell for a minimum of $300 each, and the house and five acres for a minimum of $6,000. The sale of either the house or the lots would place us on easy street, but if a good price could be gotten for the house and five acres after the lots were sold, I believe it would be a good idea to sell because the place is running down."

Two of the lots were sold to Cunningham and are not in controversy, being covered by a separate deed.

After receiving the deeds, blank as to grantee and consideration, Moran, the date not being shown, probably in the fall of 1920, inserted his own name as grantee in the deeds and a consideration the same as in his deed to Fred, and filed them, together with the guardian's deed, March 21, 1921. The guardian claims that this was in accordance with an understanding with Fred prior to the sale, which Fred denies; and claims not to have discovered the fact until the spring of 1921.

This manner of dealing with the sale, while irregular, did not result in any loss or detriment to the wards: It was the desire of all parties that the property be sold as quickly as possible to procure funds for the support and education of the wards, two of whom were attending the state university, and Eugene at a college in Illinois and

other schools. The guardian had paid these expenses from the receipts of the estate as far as possible, but had to piece them out with his own funds and money borrowed at the bank.

The guardian lived at Nebraska City and the wards, when not attending school, were at different places traveling around and employed some of the time at jobs of widely different character; Fred and Al at Antioch and other places, and Eugene in Sioux City, Iowa, Ponca, Oklahoma, and elsewhere. Contact by the guardian with the wards was intermittent and irregular, in fact they were never all together except when getting ready for school in the fall of 1916; and frequently it happened that the guardian did not have their address. Most of the business was transacted by correspondence with Fred, who became of age September 4, 1919; Al reached majority June 18, 1921, and Eugene May 15, 1923. In 1918 or 1919 Eugene went insane and is now in the hospital at Lincoln.

Moran gives as reasons for inserting his name in the deeds, that real estate agents with whom he dealt in an effort to sell the property advised him that purchasers were shy at dealing with deeds in which the consideration and grantee were blank; and, further, that as no money had been paid at the sale, if Fred should claim to own the property, the guardian would have to account for it; also that he would be in position to deliver deeds promptly in case of sale.

After the title was in Moran he dealt with the property the same as before, credited the rents to the wards, and also money received from one Fuller to whom he had made a lease or contract of sale of the home place on monthly instalments. This contract was subsequently surrendered and canceled. Moran and Fred treated the property as belonging to the wards; July 2, 1921, Fred writing to Moran: "This property should either be reconveyed to me or to Al and I or to the three of us, so that the record will be straight." April 25, 1922, Fred wrote about the Fuller contract, saying: "This property is sadly in need of repair and we should dispose of it or we will, of neces-

sity, be compelled to put it in repair." And he wrote again May 15, 1922, asking if Fuller would execute a release and suggesting that they take Madgett Brothers' offer ($5,000 cash) if still open. There was no suggestion of holding the guardian as a purchaser until it was made by the lawyers whom Fred consulted later. This position was maintained until about June, 1922. Moran had written several letters asking Fred to come to Nebraska City and settle up the guardianship matters; he and Al having come of age, Fred promised but never came, but about June 10, 1922, Al went there and spent the day going over the accounts with Moran's bookkeeper and made no objections. Up to this time Al had taken no part in the affairs of the estate, Fred acting for the three brothers. Moran asked that Al and Fred give him notes and mortgages for the amounts he had advanced them since they became of age, Al said he would have to see Fred, and upon leaving took the papers with him. Shortly thereafter, hearing nothing and meeting Al in Lincoln, Moran asked what was their decision, and Al told him that Hastings & Coufal, attorneys at David City, had advised to the effect that as Moran had the title they could hold him for its value and "we are going to hold you for the value of the property, and will settle on that basis." This was the first time any complaint had been made to Moran, or any claim made against him by reason of the property being in his name. Moran was very angry and the fight was on. Moran sued Fred and Al for the amounts he claimed to have advanced since their coming of age and for damages, and citation was procured from the county court requiring Moran to account. The Moran suits are held in abeyance until the determination of this proceeding.

There are many other matters contained in the record which might be mentioned and discussed, but such a course would unduly extend this opinion. The entire record has been read and critically considered, and we conclude that the finding of the district court is fully sustained by the evidence and we adopt it, as follows:

"14. The court finds that the guardian in inserting his name as grantee in said deeds did not do so for the purpose of taking the property for his own, but did so in order to further the purpose for which he as guardian sold the same to Fred M. Deutsch; that is, to have the title to the numerous tracts of land embodied in the deeds so that any sale under consideration might be readily and speedily consummated. Also, that he was justified in so doing for his own protection. He had received nothing from Fred M. Deutsch for the property, and if said Deutsch should insist on holding the property as his own, the guardian would have neither property nor money to turn over to the wards upon final settlement."

We conclude, further, that there is no evidence in the record that the guardian ever intended or attempted to take advantage of his wards in any way; on the contrary, while his conduct of the estate was far from businesslike, and if he had been a stranger might justify a stricter consideration, he seems to have treated the wards as members of his own family, and to have been anxious to aid them in every way to obtain an education and preserve their estate. Moran's appointment as guardian was not of his seeking. He pointed out to the boys that he lived in Nebraska City, that he was a very busy man, and that the properties were a great distance away and could not receive much of his personal attention, but the boys insisted upon his appointment to the exclusion of two other uncles and an aunt. Moran necessarily had to have an agent in Hastings, and he appointed Ingraham, upon whom he had to rely for the renting and collection of the rents of the Hastings property and the farm in Keith county. There is no evidence that the agent was an improper person. The evidence warrants no conclusion other than that the guardian intended to and did hold the title as trustee for the wards, and not as his own. Fred, of full age, who transacted all the business for the wards so understood and treated the situation for nearly a year. Under these circumstances, the wards were not entitled to an election to

treat the transaction as a conversion. The cases cited by appellants are not in point; they were cases of conversion and the property was lost to the estate. Where the purpose was to hold the property in trust for the estate and reconveyance is tendered, there is no conversion.

Complaint is made that three items charged to the guardian by the county court were not allowed by the district court: (1) That all of the rents collected by Ingraham had not been reported, an item of $210.51. The evidence in the county court is not before us and that received in the district court is not sufficient to support a finding on this item. The evidence of Ingraham is that he remitted all that was collected, and of the guardian that he accounted for all received.

(2) That the guardian was negligent in allowing the premises to remain vacant. There is no evidence to support this unless the mere fact of vacancy may be so considered. We think, however, some evidence should have been produced to support the charge of negligence, evidence tending to show that the premises could have been rented by the exercise of reasonable diligence.

(3) That the Keith county land was negligently leased for one-fourth instead of one-third of the crop, an item of $253.44. It appears that the same tenant had been on the land for many years and had always paid promptly. He had been the tenant of the wards' mother and stayed on during the guardianship. We are not prepared to say that a mere failure to raise the rent under the circumstances was such negligence as would warrant a charge of negligence against the guardian, even though, as appears, the tenant subsequently took a lease at one-third crop rental, there being some difference in terms as to delivery of rental share on the farm or at market.

One question remains: the allowance of $1,500 to the guardian for his services. The guardianship extended over a period of six and one-half years. The income from the estate was about an average of $600 per annum. Three growing boys had to be clothed, fed and educated, one of them

not very strong and finally having to be sent to an asylum. The boys worked sporadically in the vacation periods earning some money, but the guardian was compelled to borrow money on his own credit to make ends meet. The real estate was distant from the residence of the guardian several hundred miles, and it was necessary to employ an agent to look after it and collect the rents, the guardian could not give it much personal attention, which was understood, and he took the appointment under protest. He has accounted for all the moneys received. By the exercise of greater diligence he might have received a few hundred dollars more for the wards. Some of his acts were irregular, but done in good faith, and they resulted in no loss to the estate. His accounts were not scientifically kept and his reports irregular. He made reports until notified that his nephews intended to charge him with the value of the Hastings lots as for conversion. He had no intention, nor did he attempt, to take advantage of his wards. After two of the wards arrived at majority, he advanced them money to complete their schooling. The wards had the benefit of his services as a lawyer, for which no charge was made. The estate was managed in much the same way as a father would deal with his own children, rather than as a matter of business, probably because of the relationship of the parties.

We think under the circumstances it would be unjust to deny the guardian all compensation. While the amount allowed is not great, we believe the conditions will not warrant an allowance of more than $1,000 and it is so ordered.

The decree of the district court is affirmed in all things except the amount of allowance to the guardian, as to which it is reversed and cause remanded, with instructions to reduce the same to $1,000.

AFFIRMED IN PART, AND REVERSED IN PART.