STATE ex rel. ROBERTSON, Superintendent of Banks, v. FIRST STATE BANK OF RIPLEY.

Western Section. July 3, 1935.

Petition for Certiorari denied by Supreme Court, January 11, 1936.

558

Craig & Durham and C. S. Carney, Jr., all of Ripley, for petitioners.

Armstrong, McCadden, Allen, Braden & Goodman, of Memphis, for American Surety Co. of New York.

Steele & Steele, of Ripley, for D. D. Robertson, receiver.

KETCHUM, J. These are four intervening petitions in which the petitioners seek to impress a trust upon the cash assets of the defunct First State Bank of Ripley in the hands of D. D. Robertson, superintendent of banks, as receiver. The First State Bank of Ripley failed on December 21, 1932, and shortly thereafter its assets were taken in charge by the superintendent of banks as receiver under a decree of the chancery court of Lauderdale county. This bank was organized in December, 1931, for the purpose of taking over the assets and assuming the liabilities of the First National Bank of Ripley and the First Savings Bank of Ripley. This merger or consolidation was authorized and made under the supervision of the superintendent of banks, pursuant to the provisions of section 6030.1 et seq., of Williams' Code (Pub. Acts 1931, chap. 29). The officers, directors, and shareholders in the new bank were the same persons who were officers, directors, and shareholders in the two old banks.

Prior to this merger of banks, the First Savings Bank of Ripley had qualified in the county court of Lauderdale county as guardian of the estates of Sammy Ward Lacy, May Carmen Rice, and Joe Henry Woodard, all of whom were minors; and in the probate court of Shelby county as guardian of Tennie Partee, a non compos mentis. Upon its qualification as such guardian, the First Savings Bank received certain funds belonging to each of its said wards which it deposited in its own bank in separate accounts in its name as guardian for each of said wards. The funds belonging to its said wards were never loaned out or invested by said bank in the manner required of guardians by law, but were commingled with the other deposits and funds of said bank, and used by it in its own business. By appropriate proceedings had in the chancery court the said guardian was allowed to encroach upon the estate of the said Joe Henry Woodard for his support and maintenance not to exceed $35 per month.

Upon the merger of said banks, the First National Bank and First Saving Bank ceased to do business, and the First State Bank

took over all the assets and assumed all the liabilities and obligations of the old banks, including the management of said guardian funds; the ledger sheets of the First Savings Bank, including those containing the guardianship accounts in its name as guardian for these four wards, were transferred to the ledger of the new bank; so the accounts in the new bank stood in the name of the First Savings Bank as guardian for said several wards. The First State Bank qualified as guardian of Tennie Partee in the probate court of Shelby county on April 18, 1932, but did not qualify as guardian of the other three wards in the county court of Lauderdale county; the officers of the new bank handled and managed the funds belonging to said wards in all respects as they had done as officers of the First Savings Bank, even to the extent of making settlements in court, and encroaching on the corpus in the case of the said Joe Henry Woodard.

By their four intervening petitions filed in the main receivership case, the petitioners seek to impress a trust upon the cash assets of the First State Bank which came into the hands of the receiver to the extent of their several claims; this upon the ground that a trust relation existed between the First Savings Bank and its said wards, and the bank had breached its trust by commingling the funds belonging to its said wards with its own funds; that the officers of the new bank were familiar with all the facts, so that the new bank took the assets of the First Savings Bank impressed with this trust; and, further, because the new bank itself, by taking over said guardianships and managing same, and continuing to commingle said funds with its own funds, likewise, itself breached said trust, so that upon its failure its cash assets which passed into the hands of the receiver were impressed with the same trust.

The amounts due said several wards at the time the First State Bank took over said guardianship accounts were as follows:

Samuel Ward Lacy .................................$1,261.54
May Carmen Rice .................................. 4,092.56
Joe Henry Woodard ............................... 957.45
Tennie Partee .................................... 2,589.25

Total .......................................$8,900.80

At the time the First State Bank failed the amount due Joe Henry Woodard had been reduced to $688.94. The amounts due the other petitioners were unchanged. So, at the time of the failure of the First State Bank, the total amount owing to said wards was $8632.29.

It is the contention of the receiver, first, that the new bank simply took over the deposit accounts of the First Savings Bank as guardian for its said wards, and became a simple creditor of the said guardian, and that it did not become a trustee of said wards;

and, second, that at the time it took over the assets of the First Savings Bank, the latter had only $1,286.18 in actual cash in its vaults, and its total cash assets, including funds on deposit in other banks, amounted to only $8,678.09; while the amount due said wards was $8,900.80; so that before the merger of the banks, at least a portion of the wards' money had been converted and used by the guardian, and none of the wards could trace their funds into the hands of the new bank.

The chancellor was of opinion and found as a fact that the First State Bank, by assuming control over said guardianships, occupied a fiduciary relationship towards said wards, and that it breached its trust and was therefore liable as a guardian de son tort; but he held that the petitioners had failed to trace their funds into the hands of the receiver, because only $1,286.18 in actual cash had been turned over to the First State Bank when the banks were merged; and further, because they had not shown that the cash assets of the First State Bank had not at any time been less than the aggregate amount of their claims. He accordingly denied the petitioners any preference under their petitions.

There are five assignments of error which complain of the action of the chancellor in finding and holding: (1) That the petitioners are not entitled to a preference; (2) that the petitioners had failed to trace their funds into the hands of the First State Bank; (3) that the petitioners had failed to show that the cash reserve at all times exceeded the amount of the trust funds; (4) that the aggregate amount of petitioners' claims exceeded the cash reserve of the bank; and (5) that the petitions of May Carmen Rice and Joe Henry Woodard must be denied upon the further ground that the sureties on their bonds were the officers and directors of the bank which breached the trust, and were therefore responsible for the breach.

The first four assignments may be considered together.

The first (appellants' No. 3) is in such general terms that it need not be considered. As to the second, we think the chancellor was correct in his conclusion that the First State Bank, by assuming the management and control of the estates of said wards, assumed a trust relation toward them, and became liable to them as a trustee or guardian de son tort to the extent of their funds which came into its hands. The officers of the new bank acknowledge the bank's liability to said wards for the full amount of their claims; they also acknowledged that they continued to handle and manage the estates of said wards just as they had done before the merger, and that they did not loan out or invest their funds, but commingled them with the bank's own funds.

As already shown, the aggregate amount of the petitioners' claims at the time of the merger of the banks was $8,900.80, which was

more than the amount of cash assets of the First Savings Bank which came into the new bank; the First Savings Bank had on hand in actual cash at that time the sum of $1,286.18, and its total cash assets made up of cash in its vaults and cash on deposit in other banks amounted to $8,678.09. At the time of the failure of the First State Bank, the aggregate amount due petitioners was $8,632.29.

■ Under the doctrine of Knatchbull v. Hallett, L. R., 13 Ch. Div., 696, 49 L. J. Ch. (N. S.), 415, 42 L. T. (N. S.), 421, which is generally followed in this country, and which is now recognized in this state (State ex rel. v. Bank of Bristol, 165 Tenn., 461, 472, 55 S. W. (2d), 771, 774), the rule is that:

"Where a trustee blends in a bank account his own money with the beneficiary's, from which account the trustee subsequently withdraws funds, the withdrawals will be presumed to be the trustee's own funds, which he had a right to withdraw, and the balance will be presumed to include the beneficiary's funds, which the trustee had no right to use." See Bragg v. Osborn, 147 Tenn., 381, 385, 248 S. W., 19.

■ There is a conflict of authority as to whether trust funds such as this are payable only out of cash in the vaults in the insolvent bank at the time it suspended, or whether its cash on deposit in other banks can also be reached. We are unable to see any valid reason why funds on deposit in other banks, and subject to check, should not be available for this purpose just as cash in the bank's own vaults. The reasoning of the Supreme Court of Michigan on this question seems to us to be sound. They say:

"It is obvious that the funds deposited by the United Savings Bank in other solvent banks were and now are subject to withdrawal and restoration to actual possession of the defendant bank. Had they been so withdrawn the day before the receiver was appointed, he would have found in the actual possession of the defendant bank cash in an amount sufficient to cover interveners' claims. No claim is made that the total of defendant's cash on hand and its deposits in correspondent banks has been less than the amount of interveners' deposits since receipt of the same. Therefore we think it should be held that the cash on deposit in the correspondent banks should be considered the same as cash in defendant's vaults. If an action of this character were prosecuted against an individual, he would not be heard to say that the plaintiff's funds held in trust by him could not be traced or found in his possession simply because he had them deposited in his bank account. We know of no reason for applying a different test or coming to a different conclusion as to money of an insolvent bank on deposit in a correspondent bank." Reichert v. United Savings Bank, 255 Mich., 685, 239 N. W., 393, 395, 82 A. L. R., 33, 37.

And the Michigan court in concluding its discussion of this question, say:

"As above indicated, we think it is of no consequence whether the insolvent bank is holding the money in its own vaults or has it on deposit in other banks. Such is the holding in Yellowstone County v. First Trust & Savings Bank, 46 Mont., 439, 128 P., 596. The syllabus in the Pacific Reporter reads:

" 'Where a bank receiving a deposit of county funds without giving the statutory bond therefor thereby became a trustee for the county for the amount of the deposit, the county, on the insolvency of the bank, which had commingled the money deposited with its funds and used it in its business as the funds of general depositors, could follow the funds not only in the actual possession of the bank at the time it suspended, but also the funds held in correspondent banks, the expression "the funds of a bank" meaning all its funds, including deposits in correspondent banks.'

"The holding is to the same effect in People v. Auburn State Bank, 215 Ill. App., 133, where the court said:

" '. . . Whatever amount the trustee has in his possession must constitute the trust fund, whether such sum may be in one place or another as to physical location. We fail to see how the mere fact that the bank had its moneys in different places could change the character of the trust fund.''

A like holding will be found in People v. Iuka State Bank, 229 Ill. App., 4; and in Schumacher v. Harriett (C. C. A.), 52 F. (2d), 817, 820, 82 A. L. R., 1, 6, it was said in an opinion by Parker, J.:

"These credits in correspondent banks, together with the cash and cash items in the vaults of the banks, constituted its immediately available assets; and a use of one of them for the purposes of business relieved to that extent the use of the others. All were equally under the control of the bank; and if one was exhausted, there is every reason for holding that the others were subjected to the trust, on the principle of the commingling of trust funds, that there is for holding that the remaining currency is subject to the trust, although the identical currency which the cestui que trust deposited may have been paid out. In the complexities of modern banking, cash, cash items, and credit balances react upon each other so rapidly that in ordinary cases it is vain to attempt to distinguish between them. If a cash item has augmented any of them, it must be regarded as having augmented the cash assets of the bank; and, on the principle that the bank is presumed to have respected the trust funds and held them sacred, any cash assets passing into the hands of the receiver must upon the principles and subject to the limitations above stated, be held subject to the trust. There is as little reason for distinguishing between cash, cash items, and deposits in other banks in the application of the equitable doctrine,

as there would be in distinguishing between moneys kept in different vaults of the same bank. The fact that the accounts in the Richmond and New York banks were subsequently exhausted has, therefore, no bearing upon the question involved.''

Under the authority of these cases, we hold that cash on deposit in other banks, subject to check, is impressed with the same trust as the cash found by the receiver in the vaults of the insolvent bank. Many cases so holding are referred to and digested in the note to Schumacher v. Harriett, supra, in 82 A. L. R ., at pages 189 to 196, inclusive.

■ The receiver makes the further contention that the petitioners have not shown that the cash assets of the bank were never less than the amount of their claims, and that their petitions must be denied upon this ground. We cannot agree to this contention. The exact question was before the court in Grand Forks County v. Baird, 54 N. D., 315, 209 N. W., 782, 783, in which the county was seeking to impress a trust upon the cash assets of an insolvent bank. The court say:

''The judgment is limited to the cash assets. If they were ever lower than at the time the bank was closed, such fact does not appear; but we are of the opinion that, in the absence of evidence, it should be presumed that they were never less than at the time of the closing; also, that it is incumbent on the defendant to offer evidence to the contrary.''

The same question was raised in the case of Farmers' Bank of White Plains v. Bailey et al., 221 Ky., 55, 297 S. W., 938; the syllabus correctly states the holding of the court in the following language:

''Where bank holding special deposits of bonds converted the bonds and the proceeds went into the cash of the bank, and the cash-balance of the bank was not shown to have been less at any time than the balance on hand when bank closed, the special depositors were entitled to a preferred claim on the funds on hand when the bank closed, payments by bank being presumptively made from its own portion of the cash, not from the portion derived from the special deposits.''

In the opinion it is said:

''The amount of cash on hand at periods prior to the closing of the bank is not shown. It does not appear that the cash balance was ever less than the balance on hand when the bank closed.''

And in Hawaiian Pineapple Co. v. Browne, 69 Mont., 140, 220 P., 1114, 1116, where the contention was made that the claimant had not shown that the cash on hand had not been less at any time than at the time of closing, and, therefore, that the trust funds had not been wholly or partially dissipated, the court say:

''So far as we are apprised by the record, the sum of $1,-

564

801.62 was the lowest amount of cash in the bank at any time after the collection was made. If the contrary is true, the facts were in the receiver's possession; but he did not disclose them.''

This is the sound rule. The records of the bank were in the receiver's possession, and are peculiarly within his knowledge; and if the cash assets were at any time less than the aggregate amount of petitioners' claims the burden should be upon him, rather than upon petitioners, to show the fact.

Counsel for the receiver, in their brief, point to the fact that there were two deposits of state funds in said bank at the time it failed, which constituted preferred claims against the assets of the bank, and that other preferred claims had been filed. We are not concerned with this matter here, because those claims are preferred claims against the assets belonging to the bank, whereas these petitioners are seeking to impress a trust upon their own funds in the hands of the receiver. See Reichert v. United Savings. Bank, supra, 255 Mich., 685, 239 N. W., 393, 82 A. L. R., 33, 38; Leach v. Iowa State Sav. Bank, 204 Iowa, 497, 212 N. W., 748, 215 N. W., 728.

The American Surety Company of New York, the surety on the guardian bonds of Tennie Partee and Samuel Lacy Ward, has settled with the new guardians of these wards by paying the full amounts due said wards. It joins in the petitions filed herein in behalf of said wards, and asks to be subrogated to the rights of said wards in any recovery which they may have in this proceeding. It is clearly entitled to this relief.

The sureties on the guardian bonds in the May Carmen Rice and Joe Henry Woodard cases join in the petitions filed in their behalf. It is claimed by the receiver that these sureties are not entitled to have their trust beneficiaries' rights enforced for their exoneration, because they have not paid off the amount due said wards. There is no merit in this contention; all the parties in interest are before the court, and in such a case the right of the surety to exoneration before payment of his liability was established in the case of American Surety Company v. Grace, 151 Tenn., 575, 271 S. W., 739, 741. In this case the court say:

''It can make no difference to the bank, if liable, whether it pays the surety or the creditors. All parties were before the court and the chancellor undertook to protect the rights of all in his. decree. We think the bank has no standing to complain of the decree in this particular.''

The further contention is made that these two claimants are not entitled to a preference because the sureties on the guardian bonds were the officers and directors of the bank and were responsible for the commingling of the wards' funds with the bank's. There is no merit in this contention; certainly so far as the pe-

tition in behalf of Joe Henry Woodard is concerned. This petition is filed by Joe Henry Woodard, by his mother as next friend, the sureties on the guardian bond joining in the prayer of the petition that the court "adjudicate and decree the rights of all the parties . . . and adjudicate all matters arising and growing out of said guardianship matter." Joe Henry Woodard is in no way responsible for the conduct of the officers of the bank in commingling his funds with those of the bank, and relief will not be denied him because the officers of the bank happened to be the sureties on his bond, and because the granting of relief to him will result in their exoneration as his sureties.

A more serious question arises with reference to the petition of V. P. Moriarty, H. D. Folts, and R. M. Prichard, the sureties on the guardian bond for the protection of May Carmen Rice, a minor. May Carmen Rice is in no way made a party to this petition, and these sureties file this petition for their own protection, praying that said fund of $4,092.56 "be declared a trust fund and entitled to priority of payment out of the assets of the First State Bank in preference to the general depositors and creditors of said bank, and that they be indemnified and exonerated from any liability or loss under said bond," and for general relief. In the body of the petition it is alleged in general terms that the bank had commingled the funds of the said May Carmen Rice with the general deposits and cash assets of the bank, and that said fund was a trust fund, and that May Carmen Rice was now entitled to payment of same out of the cash assets of the bank in the hands of the receiver. These allegations of the petition are denied in the answer, but no point is made of the fact that the petition is filed by the sureties on the guardian bond, who were also officers of the bank and were responsible for the commingling of the wards' funds with those of the bank.

The chancellor was apparently of opinion that the petitioners had come into court with unclean hands, and that relief must therefore be denied them on that ground. But we do not think this is the case. Their claim is not that the bank has wasted or dissipated the funds of its ward, but that it kept them intact, and that they have been traced into the hands of the receiver. The petition is filed primarily for the benefit of the minor, May Carmen Rice, and enures to her benefit to the same extent as if it had been filed in her behalf by next friend. The petitioners are in the attitude of saying, "it is true it was our duty as officers of the bank to loan out or invest her funds, and that we failed to do our duty in this regard; but the bank still had her money on hand when it failed, and it is now intact in the hands of the receiver; we therefore ask that it be paid to her so that we may be relieved of liability as sureties on her bond." If May Carmen Rice were here asking

for this relief, it would be granted her, and the petitioners, as sureties on the bank's bond as guardian, would be exonerated. We think the petitioners, as such sureties, are equally entitled to maintain the petition for her benefit, in order that they may be exonerated.

In conclusion, we are of opinion that the First State Bank, in taking over these guardianship deposits, stepped into the shoes of the First Savings Bank as a fiduciary. The old bank ceased to function entirely, and the new bank assumed its fiduciary duties and obligations in every respect. The new bank formally qualified as guardian of Tennie Partee; it assumed to act just as completely as guardian for the other three wards. In short, it became a guardian or trustee de son trot. In this situation, it will not be heard to say that petitioners have not sufficiently traced their funds into ith hands.

The aggregate amount of petitioners' claims is $8,632.29; the cash assets of the First Savings Bank which passed into the hands of the First State Bank amounted to $8,678.09; and the cash assets of the First State Bank which passed into the hands of the receiver was greatly in excess of this amount.

We are therefore constrained to reverse the decree of the chancellor and hold that the petitioners have sufficiently traced their funds into the hands of the receiver, and that under the rule as laid down in Knatchbull v. Hallett, supra, said trust funds will be presumed to be embraced in the cash in the vaults of the bank, and on deposit in correspondent banks, which passed into the hands of the receiver; and said cash assets will be impressed with a trust in favor of the petitioners to the extent of their credit balances as shown on the books of the bank, and as proven herein.

Let a decree be entered here in accordance with the views herein expressed. The receiver will be taxed with the costs, the same to be paid out of the assets of the bank in his hands. Reversed.

Senter, J., concurs.

ANDERSON, J. (dissenting). As I construe the opinion of the majority of the court, it commits the court to the proposition that sureties on a corporate guardian's bond who have actively participated in the conversion of the ward's funds in the sense that they were commingled with the general funds of the principal, are, as against the rights of general creditors, entitled to relief under the doctrines of exoneration or subrogation, and this before they have discharged their liability as sureties. If such be the holding of the majority of the court, I am unable to agree to it.

"Subrogation, while distinguishable from exoneration as against the debtor or contribution from others, is used to enforce both remedies." 25 R. C. L., 1312. "Subrogation in its broadest sense is the substitution of one person in the place of another with refer-

ence to a lawful claim or right and is frequently referred to as the doctrine of substitution. It is a device adopted or invented by equity to compel the ultimate discharge of a debt or obligation by him who in good conscience ought to pay it. Its phases are various but it preserves its characteristic features throughout. It is the machinery by which the equity of one man is worked out through the legal rights of another." 25 R. C. L., 1311, 1312.

The doctrine of subrogation is an established branch of equity jurisprudence. "It does not owe its origin to statute or custom, but is a creature of courts of equity, having for its basis the doing of complete and perfect justice between the parties without regard to form. It is a doctrine, therefore, which will be applied or not according to the dictates of equity and good conscience and considerations of public policy, and will be allowed in all cases where the equities of the case demand it. . . . The right to it depends upon the facts and circumstances of each particular case and to which must be applied the principles of justice." 25 R. C. L., 1313.

The doctrine of subrogation, being of equitable origin and nature, "its operation is controlled and governed by the principles of equity and it is only when an applicant has an equity to invoke and where innocent persons will not be injured that a court can interfere. To entitle one to subrogation, his equity must be strong and his case clear." 25 R. C. L., 1314, 1315.

Subrogation is the creature of equity and will not be permitted where it will work an injustice to the rights of those having equal or superior equities or where it will operate to defeat an equal right. 25 R. C. L., 1321.

Our own cases are thoroughly in accord with the foregoing principles. Dixon v. Morgan, 154 Tenn., 389, 397, 285 S. W. 558; Federal Surety Co. v. Union Indemnity Co., 161 Tenn., 621, 33 S. W. (2d), 421.

Whether the doctrine under which the sureties here in question seek relief be termed the doctrine of subrogation or exoneration is to my mind immaterial upon the phase of the question under consideration, since both doctrines essentially are of an equitable nature and applied according to the maxims and principles of equity.

I have found no authority, and the opinion of the majority of the court refers to none, that supports the proposition that one may obtain relief under the doctrine of subrogation from the consequences of his own fault or negligence. Upon the other hand, in 60 Corpus Juris, 708, section 21, it is said:

"The person seeking subrogation must act fairly and equitably and be free from fault. It will not be allowed where he has intermeddled with the rights of others, or is guilty of fraud or culpable

negligence, or where he would derive an advantage from, or establish his claim through, his own negligence, or, in any way, would thereby reap advantage from his own wrongdoing, or from the wrongful act of one under whom he claims; nor will it be allowed where to do so would relieve a party from the consequences of his own wrongful or unlawful act.''

See, also, 25 R. C. L., 1326.

When the bank mingled the funds of the wards for which it was guardian with its own funds, it was guilty of a conversion, and all those who knowingly participated therein were likewise guilty. State v. McLemore, 162 Tenn., 129, 37 S. W. (2d), 103.

It is conceded that the bank does not have enough assets to pay the depositors and general creditors in full. Practically all of its cash will be required to pay the claims of these wards. The presumption that the funds which the bank had on hand at the time it went into the hands of a receiver are the trust funds belonging exclusively to its wards is based purely and solely upon a fiction, raised by equity, as the only practicable method of accomplishing justice to cestui que trustent who are wholly innocent of any wrongdoing. That this fiction will be resorted to when necessary to do justice to such parties is settled by our cases, but I find nothing in the books, or in the rule or principle underlying it, which would justify a resort to it for the purpose of permitting one whose act necessitated the raising of the fiction to profit by it.

In other words, the very necessity of raising the fiction was brought about solely by the act of the bank and its officials in commingling the trust funds with its general funds. This was a wrongful act on the part of the bank and those of its officials participating therein, and to permit such participating officials to have, directly or indirectly, the benefit of the fiction predicated upon such wrongful act would be to permit them to profit by their own wrong, in that, by a resort to the fiction, they would be relieved of their liability as sureties on the guardian bonds, and the amount that would otherwise be available for the purpose of paying general creditors would be decreased to the extent of the amount paid the wards.

If these sureties, who participated in the commingling of the fund, were held to their liability on the guardian bonds, the general creditors who are wholly innocent in the matter would have that much more for the payment of their claims. To permit them to be discharged in full of their liabilities in preference to the rights of the general creditors seems to me to be a misconception and misapplication of the doctrine under which they seek relief.

It is argued, however, that if the banks had in the first instance invested the trust funds as required by statute instead of commingling them with its general funds, that the general funds would

have been that much less. In other words, it is said that through the act of the bank in commingling the trust funds with its general funds the latter were augmented to that extent, and that hence no harm has in reality been done the general creditors.

One fallacy of this argument seems to me to be that depositors and general creditors dealing with the bank had no knowledge of such augmentation or that a portion of the general funds of the bank were impressed with what was, so far as they were concerned, a secret trust. In dealing with the bank they had a right to assume that the cash on hand as reflected by the bank's statements was a part of the general assets available for the payment of general creditors in the event of insolvency. If they had known that a portion of the cash was in fact a trust fund and would not be available for the payment of general creditors, it is entirely possible that they would not have dealt with the bank at all.

From any view of the case I cannot escape the conclusion that, through the opinion of the majority of the court, sureties who are shown to have been at fault in the premises are being preferred to the general creditors of the bank who are wholly innocent. I cannot reconcile this view with my idea of fundamental principles of equity which are applicable to the situation as I see it, and to the application of the doctrine upon which the sureties rely for relief. Therefore, I respectfully dissent from that part of the opinion of the majority of the court which grants any relief to any surety shown to have been guilty of participation in the conversion of the funds. In all other respects, I concur in the majority opinion.