[No. 26555.   Department Two.   May 25, 1937.]

JOSEPH ZEALAND GOODWIN, *Respondent*, v. AMERICAN
SURETY COMPANY OF NEW YORK, *Appellant*, HAR-
RINGTON STATE BANK, *Respondent*, ELI GOOD-
WIN, *Defendant*.[1]

[1]Reported in 68 P. (2d) 619.

*Floyd J. Underwood* and *Graves, Kizer & Graves,* for appellant.

*Roy C. Fox,* for respondent Goodwin.

*Pettijohn & McCallum,* for respondent Harrington State Bank.

STEINERT, C. J.—Plaintiff brought this action against three defendants, namely, his former guardian, the surety on the guardian's bond, and a local bank, to recover certain sums of money alleged to have been paid by the guardian from the funds of plaintiff's estate to the bank without authority. The guardian defaulted in the action. The surety and the bank appeared separately and in their answers denied liability. By way of cross-complaint against the bank, the surety asked to be subrogated to any rights which plaintiff might establish against the bank. Trial before the court, without a jury, resulted in a judgment in favor of plaintiff against both the guardian and the surety, but exonerating the bank from any liability to either the plaintiff or the surety. This is an appeal by the surety alone and is adverse to both the plaintiff and the bank.

For convenience and brevity, and as occasion may require, we shall hereinafter refer to Joseph Zealand Goodwin, the plaintiff respondent, as plaintiff, son, or ward; to Harrington State Bank, a corporation, the other respondent, as the bank; to American Surety Company of New York, a corporation, as appellant, or surety; and to Eli Goodwin, defendant, but not a party to this appeal, as guardian, or simply as Goodwin.

Lillie May Goodwin, wife of defendant Goodwin, and mother of plaintiff, died intestate in Lincoln county in 1920, leaving an estate consisting of her community interest in a large wheat farm near Harrington, Washington, and certain lots in the town of Harrington, and a like interest in certain personal property, including live-stock, machinery, farm equipment, household furnishings and eight hundred dollars in Liberty bonds. She left, as her sole heirs at law, her surviving husband and her son, the plaintiff, who was then six years of age. The entire property in which Mrs. Goodwin had a community interest was appraised at. $53,370.50. The wheat farm, which we will hereinafter at times refer to as the home place, was incumbered with a mortgage in the sum of $9,000, on which there was delinquent interest amounting to $720, and with delinquent taxes amounting to $825.

After his wife's death, and until some time in 1928, Goodwin continued to farm the home place in much the same way as he had done for many years before.

On November 23, 1921, which was a year after his wife's death, Goodwin was appointed, and qualified, as guardian of the person and estate of his son, the plaintiff. Appellant became surety on the guardian's bond in the sum of two thousand dollars. The bond contained the following provision:

"The Condition of this obligation is such that if the above named Principal Eli Goodwin who has been appointed guardian for Joseph Zeland Goodwin, minor shall faithfully discharge the office and trust of such guardian according to law and shall render a fair and just account of his guardianship to the superior court for the county of Lincoln from time to time as he shall thereto be required by such court, and comply with all orders of the court, lawfully made, relative to the goods, chattels, moneys, care, management and education of such minor, . . . or his . . . property, and render and pay to such minor . . . all

moneys, goods, chattels, title papers and effects which may come into the hands or possession of such guardian, at such time and in such manner as the court may order or adjudge, then this obligation shall be void, otherwise to be and remain in full force and effect."

Immediately upon qualifying as guardian, Goodwin petitioned the probate court for leave to place a fourteen thousand dollar mortgage on the home place, the proceeds of which were to be used to take up the existing mortgage which was then past due, and to pay delinquent taxes, the necessary operating expenses of the farm, and living expenses of himself and plaintiff.

In that petition, and throughout all the subsequent court proceedings, the plaintiff's legal interest in the home place was described as an undivided one-half interest in the entire farm. The briefs herein likewise refer to plaintiff's interest in the same manner, and we will, therefore, consider plaintiff's interest in the home place as being an undivided one-half interest therein.

After a hearing, at which plaintiff was represented by a guardian *ad litem*, the petition of the guardian was granted, and shortly thereafter the mortgage for fourteen thousand dollars was executed.

On November 21, 1923, Goodwin and the bank entered into a written agreement by the terms of which the bank agreed to sell and Goodwin, individually, agreed to buy a section of wheat land, hereinafter referred to as the Gohlman place, for the sum of $34,600, of which $18,000 was to be paid by the assumption and payment of an existing mortgage in a like amount, and the balance of which, or $16,600, with interest, was to be paid by sacking and delivering to the bank at a warehouse in Harrington one-half of all crops to be harvested from the land over a period ending December 15, 1931, on which date the amount then owing on the contract was to be paid in full.

On March 2, 1925, certain arrearages having accumulated, the contract was modified to the extent that the total purchase price was increased to $37,400, of which $15,000 was to be paid by the assumption and payment of the existing mortgage then standing in that amount and the balance of $22,400 to be paid upon the same terms as those provided in the original agreement.

Goodwin operated the Gohlman place from the time of its purchase from the bank until some time after 1928. Although that was his separate property, he nevertheless operated it in connection with the home place, that is to say, the machinery and equipment in which the plaintiff owned an undivided one-half interest were used on both places and the annual receipts from the sale of grain from both went into one check and were deposited by Goodwin in the bank to his personal credit. The Gohlman place produced crops in 1925 and 1927 and probably, to a small extent, in 1928. It did not produce anything in 1926.

Payments were made by Goodwin to the bank on the Gohlman land contract in the years 1925, 1926, 1927, and 1928, respectively. It may be well to state, at this point, that these payments form the basis of this lawsuit. The amounts paid on the contract in 1925, 1926 and 1927, together with the taxes paid in those years on the Gohlman land, totaled $14,190.60, one-half of which, or $7,095.30, is claimed to have been paid from funds belonging to plaintiff. The payment made in 1928, amounting to $5,119.56, is claimed to have come from the same source, but will be treated separately.

On October 26, 1926, the guardian petitioned the court for permission and authority to place a new mortgage of eighteen thousand dollars on the home place. In the petition, it was recited that the former mortgage of fourteen thousand dollars, with accrued

interest, had become due, that taxes were delinquent, and that for the past year or more the land had not produced sufficient to pay the expenses of operation, interest, taxes, and living requirements of the guardian and plaintiff, and that, in addition thereto, there was owing by the guardian the sum of $4,295, with interest. At the same time, the guardian filed a report and account of his doings and operations from the time of his appointment to the date of the report.

It appears from the report that the total amount of receipts from wheat raised on the home place during the entire period up to that time was $29,474.96, and that the amount paid for farm operations and interest was $26,287.89; however, according to the report, the balance of receipts was more than equaled by a sum of $6,300 which the guardian and ward owed jointly at the time of the guardian's appointment. This was the first, and only, report made by the guardian prior to 1935.

After a hearing, at which plaintiff, then about twelve years of age, was represented by a guardian *ad litem*, the report was approved, the guardian's petition was granted, and the new mortgage was executed. At the same time, and upon demand of the mortgage company loaning the money, an additional bond was executed by the appellant surety company in the sum of sixteen thousand dollars. That bond contained the same obligations and conditions as those above quoted from the original bond. Upon these two bonds the liability of the appellant in this action is rested.

In December, 1926, and again in December, 1927, the guardian procured an order from the probate court authorizing him to borrow from the bank sums of money, the amounts not being specified, for the purpose of carrying on farming operations on the home

place for the years 1927 and 1928, respectively. It does not appear that the plaintiff ward was represented at either of the hearings at which such permission was granted.

While Goodwin was operating the Gohlman place, from 1924 to 1928, an account was kept of the amount of grain harvested thereon annually, separate from that produced on the home place. The purpose of this was to enable Goodwin, as well as the bank, to know how much the bank was entitled to be paid under the terms of the purchase contract. However, as already stated, all receipts from the sale of wheat, both from the Gohlman place and from the home place, were commingled and deposited in the bank to the personal account of Goodwin.

We now come to the climax of these various transactions and proceedings. What we are about to state concerns the payment made by the guardian on the Gohlman place in 1928.

On September 26, 1928, the guardian filed a petition for leave to sell the ward's undivided one-half interest in the home place. The petition recited, among other things, that, during Goodwin's operation of the home place on behalf of himself and of plaintiff, an unsecured indebtedness of approximately $12,500 had accrued, the greater part of which, he alleged, was owing to the bank; that one-half of that amount was chargeable against the estate of plaintiff; that the income from the property was insufficient to pay interest, taxes, and farming operations; that those operations had been carried on for a long time at a loss; and that it would be to the best interest of plaintiff if farming operations were discontinued, the property sold, and the proceeds, after paying off the indebtedness properly chargeable against the ward, reinvested *in interest-bearing securities.* The petition

made no mention of the Gohlman place or of its acquisition and operations by Goodwin.

Upon a hearing in court, at which the plaintiff was represented by a guardian *ad litem,* who resisted the application, an order was entered granting the authority requested and directing that a private sale of the jointly-owned property be had. Appraisers were appointed, who appraised the ward's undivided one-half interest in the home place at $7,800 and his interest in the personal property at $2,000, or a total of $9,800.

Shortly after the entry of that order, John E. Russell, who was the president of Harrington State Bank, bid the appraised price for plaintiff's undivided one-half interest and subsequently purchased the entire home place and personal property, including the interest of both Goodwin and the plaintiff, for $14,638. It is thus apparent that only $4,838 was paid for Goodwin's undivided one-half interest. In due time, the sale of plaintiff's interest in the property was confirmed by the court.

The total purchase price of $14,638 was deposited in the bank, and, on the day following, Goodwin drew a check for $9,871, payable to the bank, to be applied on his individual contract to purchase the Gohlman place. What became of the rest of the money so deposited does not clearly appear from the record, but, as we read the evidence, it is fairly inferable that at least a part of it was applied on the unsecured indebtedness owing to the bank. It does appear from the record, however, that the bank well knew the sources from which the $14,638 deposit was obtained, namely, from the sale of the home place, including plaintiff's interest therein. The total amount found by the court to have been paid on the Gohlman place in 1928, out of funds belonging to plaintiff, was, as already stated, $5,119.56.

In 1932, the surety company canceled both of its guardianship bonds for nonpayment of premiums. Goodwin had by that time, it seems, lost almost all of his property and had become insolvent.

On July 20, 1935, the plaintiff, who had been living continuously with his father, became of age. Thereafter, on August 9, 1935, plaintiff filed in the guardianship proceeding a petition for an accounting of his estate and for the surrender of all money and property belonging to him. Citation was issued and served upon Goodwin, but no notice or process of any kind was served upon the surety company.

A hearing on the petition was had on August 17, 1935, at which testimony was taken. On August 27, 1935, the probate court entered a decree reciting that Goodwin, acting in his individual capacity and as guardian of plaintiff, by authority of the court, had operated the home place and had borrowed money and incurred indebtedness on behalf of himself and the plaintiff, and that one-half of the money so borrowed for farming operations was made a charge against plaintiff's estate; that, without any authority whatsoever, Goodwin had purchased additional land and thereafter had made payments thereon totaling $12,214.86, which, with interest to date of the decree, amounted to $18,790.81, out of funds and moneys belonging to plaintiff's estate. On the basis of the facts so found, the court ordered and directed the guardian to pay the latter amount to plaintiff.

After the entry of that decree, this suit was instituted in the superior court on September 6, 1935, seeking recovery against the guardian, his surety, and the bank. The trial court predicated its judgment against the surety upon the holding that the decree of the probate court entered on August 27, 1935, in the guardianship proceedings was conclusive. The court was

of the further opinion that the bank was justified in dealing as it did with the deposits made by the guardian, and therefore exonerated it from all liability.

Facts, in addition to those already recited, and bearing upon particular matters involved, will be stated when we come to the discussion of those questions.

The issues presented to us involve a very complicated situation. We not only have four different parties whose interests appear to be mutually antagonistic, but we also have a variety of rules and principles to be considered in determining the relative rights and duties of the respective parties concerned. We have here a ward whose estate has, in one way or another, become wholly exhausted. We have a guardian who has managed, or else mismanaged, the estate of the ward, commingling it, or the proceeds thereof, with his own property. We have a compensated surety who is now called upon to make good to the ward the loss occasioned by the acts of the guardian. We have a bank which was not only the depositary of the ward's general funds carried in the guardian's personal account, but which also dealt directly and knowingly with the guardian with respect to a certain part of the ward's estate.

Since no appeal was taken by the plaintiff from the judgment in favor of the bank, all of the questions presented to us here must be considered upon the appeal of the surety.

Appellant's assignments of error may be grouped under two general heads: (1) Error of the court in holding that the decree entered in the guardianship proceeding on August 27, 1935, was conclusive upon the appellant; and (2) error of the court in denying recovery to appellant against the bank. The first of these assignments relates particularly to the payments made by the guardian to the bank on the Gohlman

place in 1925, 1926 and 1927. The second assignment relates solely to the payment made by him to the bank in 1928.

In view of the fact that we have adverted to the many interim petitions filed by the guardian and the orders made thereon by the probate court authorizing the guardian to borrow and expend moneys on behalf of the ward, and in order that there may be no erroneous impression as to the possible controlling effect of such interlocutory proceedings, we first point out and affirm the well established rule that intermediate accounts, reports and applications, even though approved, are not final or conclusive either as to the ward or as to the person charged with the duty of protecting his interests, but may be reconsidered upon the final hearing and settlement. *In re Carlson,* 162 Wash. 20, 297 Pac. 764; *In re Di Carlo's Estate,* 3 Cal. (2d) 225, 44 P. (2d) 562, annotated in 99 A. L. R. 990.

It may be conceded that, from the evidence developed before the superior court, considered apart from the final decree in the previous hearing in the guardianship matter, it might have been held that the payments which the guardian made to the bank on the Gohlman place in 1925, 1926 and 1927 came entirely from the proceeds of the wheat produced on that place in those years, or else from funds borrowed by Goodwin personally and individually. The trial court frankly expressed a leaning toward that conclusion, but felt that it was precluded from so holding because of the final decree made in the guardianship proceeding and the decisions of this court defining the rules of liability applicable to sureties on bonds.

Whatever general diversity of opinion there may be upon this particular subject, the rule is definitely settled in this state that, when a surety undertakes to pay such amounts as may be recovered

against his principal, and not simply to answer in general terms for the faithful performance of a duty imposed by law or arising out of the official character of the principal, such surety is, in the absence of fraud, collusion, or other equitable defenses, conclusively bound by the judgment and is held to pay the same, even though he had no notice of the action against the principal or opportunity to defend therein. *Costello v. Bridges,* 81 Wash. 192, 142 Pac. 687, L. R. A. 1915A, 853; *Larson v. Deering,* 97 Wash. 616, 166 Pac. 1119; *State v. Fidelity & Casualty Co.,* 142 Wash. 400, 253 Pac. 446.

In the *Costello* case, *supra,* we said at pages 197 and 198:

"Abstractly stated, the first question is, can a surety be bound by a judgment against his principal, which was rendered in an action to which the surety was not a party and of which he had no notice, and, if so, when? Few questions can be found presenting a greater contrariety of decision. Many cases hold that such a judgment is *res inter alios* and inadmissible as evidence against the surety; many that it is admissible, but only *prima facie* evidence, and others that, when admissible at all, it is conclusive evidence of the amount of the liability of the surety. . . .

"Notwithstanding the wide diversity of opinion in other respects, it may now be considered a well established principle that, when the surety, either by the express terms of his agreement or by a fair and reasonable implication from the nature and intent of his obligation, has undertaken to pay the damages and costs which may be recovered against his principal, he is, in the absence of fraud or collusion or other equitable defenses, conclusively bound by the judgment, though he had no notice of the suit against his principal."

The other two cases above cited either specifically affirm or else impliedly recognize the general rule, but, because of the facts involved therein, were rested upon

the exception that, where the surety merely engages generally to answer for the faithful performance of a duty imposed by law or growing out of an official relationship, the judgment against the principal is not conclusive, but only *prima facie* evidence in the suit brought against the surety.

The rule, expressed somewhat conversely, and stressing its particular applicability to guardianship matters, is thus stated in Pingrey on Suretyship and Guaranty (2d ed.), § 65, p. 72:

"It is said to be a general rule that a judgment against a principal is admissible as prima facie evidence in an action against the surety, and that sureties upon official bonds are not concluded by a decree or judgment against their principal unless they have had their day in court or an opportunity to be heard. There is, however, a large class of cases especially those of guardian and administrator bonds which are sometimes spoken of as exceptions to the general rule, which sustain the doctrine that sureties are bound by the judgment against their principal to the same extent that their principal is, and such judgment is conclusive against the sureties in the absence of fraud or collusion. And if the effect of the obligation is such that the surety is to be bound by the results of the litigation between others he is, in the absence of fraud or collusion, bound by such results. Where the bond is not merely to pay damages, but is an indemnity against liability by judgment, it is conclusive. If it undertakes to pay such judgment as may be recovered, that judgment is conclusive, because that judgment is the event on the happening of which the surety agrees to pay."

Turning now to the two bonds in question here, we find that, by their terms, the surety bound itself to pay the amounts thereof unless the guardian should faithfully discharge his trust, comply with all orders of the court and pay to the ward all moneys, goods and chattels which might come into its possession, at such times and in such manner as the court should adjudge. That

was, in effect, an undertaking on the part of the surety to abide by and perform any judgment of the court in the guardianship proceeding.

■ Appellant contends, however, that, under the rule thus declared, it had the right to show fraud, collusion or, as an equitable defense, mistake of fact, and that the evidence at the trial in the superior court showed that one or another of such defenses had been established.

For proof of fraud or collusion, appellant emphasizes the following facts: That the father and son, guardian and ward, had, at all times prior to the son's claim for restitution, lived together amicably; that the father never made any claim for services as guardian or for the support or education of his son; that he did not notify the surety that he had been cited into court; that he had appeared at the hearing without assistance of counsel; and that he did not avail himself of the bank's records to show that the payments on the Gohlman place were from the proceeds of the crops grown thereon or from moneys borrowed by him on his own credit.

Each of these charges has a reasonable explanation.

Fraud must, of course, be established by evidence that is clear, cogent and convincing.

There was no reason why the relations between the father and son should have been otherwise than amicable. Prior family amicability, however, does not deprive the ward of his right to insist upon an accounting of his inheritance when it becomes due, nor is his insistence upon that right of itself any proof of fraud or collusion between him and his guardian. Intimacy of relationship often leads to a laxity of business conduct, but this court has frequently said that, where such relationship involves transactions between a guardian and his ward or such commingling of funds

by the guardian or trustee as may result to the detriment of the ward, there is, then, a greater need for a jealous watchfulness and guarding of the ward's interests. *In re Anderson,* 97 Wash. 688, 167 Pac. 71; *In re Carlson,* 162 Wash. 20, 297 Pac. 764.

It would have been futile for the guardian, at the final hearing before the probate court, to have asked for compensation for his services, because, under the facts shown by the entire record here, he would not have been entitled to any. *In re Anderson,* 97 Wash. 688, 167 Pac. 71; *In re Gardella,* 152 Wash. 250, 277 Pac. 846; *In re Carlson,* 162 Wash. 20, 297 Pac. 764.

As to support and education of the minor son, it was the duty of the parent to provide both, until it had been shown in some proper proceeding, and in a proper way, that it was necessary to dispose of the ward's estate, or some part of it, in order to meet such particular expenses. *In re King,* 151 Wash. 120, 275 Pac. 82, 67 A. L. R. 1397; *In re Rohne,* 157 Wash. 62, 288 Pac. 269.

It is true that the guardian did not advise the surety that he had been cited into court. While he might have done so, he was not compelled to. It must be remembered that the surety was not a local individual, whom the guardian could readily have contacted, but was a surety company having an office in a distant part of the state and with whom the guardian had not dealt directly. It will also be recalled that the surety had canceled both bonds several years prior to that time for nonpayment of premiums, and there is no proof that the guardian knew that the surety was still liable thereon. Besides that, the surety itself had never, before that time, taken any proper steps to guard the estate from loss, by requiring the guardian to comply with the law's demand with reference to necessary reports and accountings.

The fact that the guardian appeared in court with-

out counsel is of no great moment, under the circumstances shown. His appearance in answer to the citation was compulsory. He was, however, insolvent at the time and in no position to incur the expense of an attorney. More than that, his revelations at the subsequent trial of this case disclosed a situation that could not have been ameliorated by the presence of counsel at the guardianship hearing.

The charge that the guardian did not avail himself of the bank's records does not, in the light of the evidence before us, fully support appellant's conclusion. The fact is, as disclosed by the record, that the manager of the bank was subpoenaed to produce at the final guardianship hearing all the records of the bank concerning moneys borrowed from or paid to the bank by Goodwin both in his personal and in his fiduciary capacity. The findings of the court contained in the final decree of settlement of the minor's estate make it very apparent that the proof on which the decree was based was supplied largely by the bank's own records.

The mistake of fact asserted by appellant is that the actual facts were not presented in their true light to the probate court at the guardianship hearing. If the same facts were presented at that hearing as were subsequently revealed at the trial of this case, then there was merely an error of law of the probate court culminating in its decree directing payment. It is a fixed and settled rule in this state that judgments will not be vacated for errors of law, and the same rule applies to decrees in probate. *In re Jones' Estate,* 116 Wash. 424, 199 Pac. 734; *In re Downings' Estates,* 146 Wash. 154, 262 Pac. 235.

If, on the other hand, the facts presented at the two hearings were different, there is nothing in this record to show it. It appears that the guardian and

also an officer of the bank testified at the former hearing, and that their testimony was taken down and preserved. Although appellant had ample opportunity to get a transcript of the testimony, it took no steps to do so, and hence that evidence was not produced before the trial court in this case. Nor did appellant in any manner show what facts had been elicited at the prior hearing. Since we do not have before us the evidence upon which the probate court passed judgment, manifestly we can not now say that its judgment was wrong. *Simmons v. Department of Labor & Industries,* 175 Wash. 290, 27 P. (2d) 567, and cases therein cited.

Nor did appellant intervene in the guardianship proceeding either for the purpose of appeal from the decree or to have the decree set aside or modified, even though it had ample time and opportunity to do so. Being bound by that decree as privy thereto, it had the same right to apply for its vacation or modification within the statutory period as if it had been a nominal party. *Litzell v. Hart,* 96 Wash. 471, 165 Pac. 393. Not having availed itself of its right and opportunity, appellant can not now be heard to say that the decree of the probate court was wrong.

We are compelled to hold, upon the facts and circumstances shown, that the former decree was conclusive upon appellant.

We take up, next, appellant's second assignment of error.

Appellant concedes its liability to plaintiff for the payment of $5,119.56 made by the guardian on the Gohlman place in 1928, but contends that it was entitled to be subrogated to plaintiff's rights and to have judgment in that amount against the bank. It may be observed here that appellant's claim to subrogation is limited to this particular payment.

It will be recalled that plaintiff did not recover against the bank. Appellant, of course, does not claim that its concession of liability necessarily establishes the liability of the bank, but contends that, regardless of the court's judgment exonerating the bank, the latter is still liable in so far as appellant is concerned.

We have already detailed the facts in connection with that transaction, and have pointed out that the payment of that amount came directly from the sale of plaintiff's undivided one-half interest in the home place, and that the bank was conversant with all the facts in connection therewith.

There are some further facts that should be considered in relation to this particular phase of the case.

The record discloses that, at the times that the two guardianship bonds were executed by the appellant, there was an arrangement between appellant and the bank under which the assistant cashier of the bank was customarily nominated and appointed by the appellant as its local agent. From time to time, the bank had occasion to change its assistant cashier, and, upon each occasion, the appellant was notified and the corresponding change made by it in the appointment of its local agent. Finally, with the view of avoiding the necessity of making repeated changes of agency, appellant suggested to the bank that, instead of having its assistant cashier act as the appellant's agent, the bank itself should be so designated. The bank at first acceded to this suggestion, but, shortly thereafter, concluded that it would be better if the usual custom were followed. Accordingly, the bank itself was never designated as agent, and the appellant continued to be represented by the bank's assistant cashier.

The execution of the second bond, which was in the sum of sixteen thousand dollars, resulted after a course of correspondence between appellant and the bank

through its assistant cashier. Appellant was advised that the mortgage company making the loan was insisting on an increased bond. Appellant thereupon executed and sent the bond, but requested that it should not be delivered until the bank had furnished appellant with more information concerning the estate, and further suggested that Goodwin be required to file his guardianship report. In another letter to the assistant cashier, appellant suggested that joint control of the estate be taken upon the sale of the property, but was advised by the assistant cashier that the assets were not of a depositable nature. Appellant was never informed by the bank or by its assistant cashier that the home place was sold for cash or that the bank had applied, or intended to apply, the proceeds thereof to Goodwin's individual contract to purchase the Gohlman place.

It may be conceded that the bank was not technically the agent of appellant, but there can hardly be any question that the bank was fully conversant with all the correspondence between its assistant cashier and appellant and, particularly, with all the facts and circumstances concerning the sale of the ward's interest in the home place and the application of the proceeds thereof upon the personal obligation of Goodwin, the guardian, to the bank.

The bank knew, of course, that appellant was, by the terms of its bond, assuming an obligation upon a transaction in which the bank's officers were interested and concerned. The bank's president was the purchaser of the property; the bank's manager or cashier negotiated the deal and received a commission of six hundred dollars therefor; and the bank's assistant cashier, acting also as the local agent for appellant, arranged for the bond. We think that, under these cir-

cumstances, it was the duty of the bank to advise appellant fully of the facts involved in the transaction.

But, in addition to what has just been said, it is indubitably the fact that the bank knowingly participated in a transaction amounting to a conversion by the guardian and involving the ultimate liability of the appellant, which the latter is now required to pay. Had the appellant been apprised of the true facts of the last transaction, it would at least have had the opportunity of making provision for the application of the proceeds of the sale to the indebtedness of the ward instead of their being applied to the individual indebtedness of Goodwin. The bank having had full knowledge of the facts and having participated to its advantage in the misapplication of the funds derived from the sale of the plaintiff's estate, we think that it should be held liable to those who have sustained the loss.

The bank, however, contends that it can not be held liable to appellant for any one of three reasons: (1) The bar of the statute of limitations; (2) that the appellant is not entitled to subrogation, because it has not been shown that it has paid the judgment taken against it; and (3) that there was no proof of conversion by the bank.

■ The bank relies upon the three-year statute of limitations, Rem. Rev. Stat., § 159 [P. C. § 8166]. Appellant concedes that the action was not brought within three years after the date of the transaction complained of.

But there is another section of the statute that must be considered as applicable here. Rem. Rev. Stat., § 169 [P. C. § 8176], provides:

"If a person entitled to bring an action mentioned in this chapter . . . be, at the time the cause of action accrued, . . . under the age of twenty-one years, . . . the time of such disability shall not be a part of the time limited for the commencement of action."

■ The bank contends that, inasmuch as, under Rem. Rev. Stat., § 1576 [P. C. § 9908], guardians of minors have power and authority to represent their wards in all matters, and may sue and be sued as such guardians, therefore the right to bring an action for the protection of the ward's estate is vested in the guardian and he alone can bring such action. The conclusion drawn from this contention is that, since Goodwin, the guardian, did not himself bring an action against the bank for his own misdeed, within the time allowed, the ward may not do so, and that consequently there is no right to which appellant can claim subrogation.

It is undoubtedly the general rule that, whenever a right of action which exists in favor of a trustee is barred by the statute of limitations, the right of the *cestui que trust* is likewise barred. To this rule, however, there is a well-recognized exception.

Where a trustee, such as an administrator, guardian, or other representative of a person under legal disability, has been guilty of converting the estate of his *cestui que trust,* neither the trustee nor one who has received the estate from him with knowledge of the facts may plead the bar of the statute. One who takes or purchases trust property with knowledge of the trust stands in the place of his grantor and is himself chargeable with the trust or, as sometimes expressed, is accountable as a trustee *ex maleficio.* This is upon the principle that the title of the *cestui que trust* has not been affected by the transfer. *Locke v. Andrasko,* 178 Wash. 145, 34 P. (2d) 444; *Elliott v. Landis Machine Co.,* 236 Mo. 546, 139 S. W. 356; *Mann v. Bank of Greenfield,* 323 Mo. 1000, 20 S. W. (2d) 502; *Duckett v. National Mechanics' Bank,* 86 Md. 400, 38 Atl. 983, 63 Am. St. 513, 39 L. R. A. 84; 3 Pomeroy's Equity Jurisprudence (4th ed.), § 1048, pp. 2379 *et seq.;* 2 Perry on Trusts (17th ed.), §§ 828, 832, 840; 2 Wood on

Limitation of Actions (4th ed.), § 208, p. 969; 17 R. C. L., pp. 958, 959, § 326.

If the exception to the general rule were not effectual, then a trustee, by his failure to bring suit to set aside his own wrongful act, participated in by a third party, could wreck an estate and prevent a minor, or one suffering under some legal disability, from ever recovering, no matter how strong the justification. This would not be equity and, we think, should not be the law.

The bank's second contention is that, before the appellant can invoke the doctrine of subrogation, it must allege and prove that it has paid the debt due the ward.

It will be borne in mind that all parties connected with the particular transaction were before the court in this suit, and that in its cross-complaint appellant prayed that, unless plaintiff's complaint were dismissed, it might be subrogated to the rights of the plaintiff as against the bank and the guardian, and for such additional relief as would be equitable under the circumstances.

It is undoubtedly true that the general rule is that the doctrine of subrogation requires that the person seeking its benefit must have paid the debt due his creditor before he can be substituted to the creditor's rights. The rule is most often invoked and applied in cases where the party seeking to be subrogated to another's rights institutes an independent action for that purpose before his own obligation has been established. The reason for applying the rule is that, otherwise, the party seeking subrogation might recover in an action brought by him and then, in turn, successfully defend in an action brought against himself by the original party wronged. In this way, the subrogated

party would be able to recover for a loss that he had never sustained.

But where, as here, all parties are before the court and the obligation of the surety upon its bond has been established and the evidence also shows, as we specifically find herein, that the liability of another, in this case the bank, to whom the surety is not responsible, has also been established, the surety is entitled to a decree subrogating it to the rights of the plaintiff, upon payment of the debt by the surety. *Maryland Casualty Co. v. Washington Nat. Bank,* 92 Wash. 497, 159 Pac. 689; *American Surety Co. v. Grace,* 151 Tenn. 575, 271 S. W. 739; *State ex rel. Robertson v. First State Bank of Ripley,* 19 Tenn. App. 556, 91 S. W. (2d) 1039; *Bankers' Surety Co. v. Linder,* 156 Iowa 486, 137 N. W. 496.

In *Maryland Casualty Co. v. Grays Harbor County,* 159 Wash. 356, 293 Pac. 441, wherein several parties were involved, each asserting rights against the others, this court directed that a decree be entered which should provide that, when the county's judgment against the sureties had been satisfied, the sureties might, to the extent that they had contributed to the satisfaction of the judgment, be subrogated to the county's rights. That is all that the appellant is asking here with respect to the bank, and to that we think it is entitled.

The bank finally contends that, under the evidence, no conversion by it was shown. The argument is that, since the guardian and the ward jointly owed the bank the sum of $12,500, which was unsecured, the bank was entitled to that amount in any event, and that it is therefore immaterial that the bank applied the money on the real estate contract covering the Gohlman place.

It may be true that, had the bank applied the money

to the joint debt, it would have been within its rights, but it did not do that. It applied the money to a debt for which the ward was not liable at all. Because of such misapplication, the appellant became liable upon its bond to the ward. Had the transaction been regular, the court no doubt would have approved it upon the final hearing in the guardianship proceeding, with the result that the appellant's liability would have been reduced accordingly. Instead of that, the bank, by misapplying the funds, has rendered fixed and certain the liability of the appellant, which otherwise would at least have been doubtful.

Although the trial court exonerated the bank from all liability to the plaintiff, and although the plaintiff is not appealing from that much of the decree, we are of the opinion that, as between the bank and the appellant, the bank was equally responsible with the guardian for the conversion of the funds paid to it on the Gohlman place in 1928, and that the appellant is entitled to be subrogated to, and to enforce, the rights of the plaintiff. In other words, we hold that the court was in error in absolving the bank from liability for the application of the funds derived from the sale of plaintiff's property in 1928, and that the appellant is entitled to urge that error in the protection of its own rights.

The decree of the court will be modified to the extent of allowing appellant recovery against the bank in the sum of $5,119.56, with interest thereon at the rate of six per cent per annum from the 27th day of October, 1928, when it shall have been established that appellant has satisfied plaintiff's judgment against it. Respondent plaintiff will recover costs against appellant, and appellant will recover costs upon its cross-appeal against the bank.

BEALS, TOLMAN, and ROBINSON, JJ., concur.

HOLCOMB, J. (dissenting)—The author of the prevailing opinion is thorough and accurate in the statement of the facts and issues.

There is no precedent, however, for the modification of the judgment in this case as decided. *Maryland Casualty Co. v. Grays Harbor County,* 159 Wash. 356, 293 Pac. 441, is not such a precedent, for there the court said:

"The sureties should have paid the whole of the county's deposit claim, as they were legally bound to do immediately upon the incurring of the insolvency of the bank, and then they could have been let into the shoes of the county as to all of its claims against the assets of the bank."

In *Chapman v. Ross,* 152 Wash. 262, 277 Pac. 854, we held that subrogation will not be allowed where the prior debt has not been discharged by the payor.

It is apparent in this case that respondent plaintiff has no judgment against the bank to which the surety could be subrogated, and that the surety has neither paid nor offered to pay any indebtedness which the payor may have owed to him. Such payment is necessary before the surety company can be subrogated to the rights of plaintiff respondent.

The judgment of the trial court was right and should be affirmed.