[No. 28209.  Department Two.  June 6, 1941.]

*In the Matter of the Guardianship of* NORENE ALMA REDICK LeFEVRE, *a Minor.*

NORENE ALMA REDICK LeFEVRE, *Respondent,* v. FIDELITY & DEPOSIT COMPANY OF MARYLAND, *Appellant.*[1]

[1]Reported in 113 P. (2d) 1014.

146

*Williams, Williams & Cooney,* for appellant.

*Roy C. Fox, Howard C. Frissell,* and *Wilmot W. Garvin,* for respondent.

JEFFERS, J.—This action was instituted by Norene Alma Redick LeFevre, by a petition filed in her guardianship proceedings, to require Annie R. LeFevre, her guardian, to render an accounting, and requiring

the guardian to turn over to her any funds still in the hands of the guardian, belonging to petitioner.

The petition alleges that Annie R. LeFevre was duly appointed guardian of the estate of petitioner on March 13, 1923, and has at all times since been such guardian, and that, although petitioner became twenty-one years of age on October 18, 1939, the estate has never been distributed to her. It is further alleged that there came into the possession of such guardian the sum of $1,305.63, on March 14, 1927, which the guardian still holds for the benefit of petitioner.

Upon the filing of this petition, a notice was served upon F. A. McMaster, attorney for the guardian, and upon Fidelity & Deposit Company of Maryland, surety on the guardian's bond, notifying them that the petition, a copy of which was attached to each notice, would be brought on for hearing on January 24, 1940.

On January 24, 1940, the guardian filed a report, from which it appears that the guardian received the sum of $1,305.63, belonging to the estate of petitioner; that the guardian took this money, together with approximately seven hundred dollars of her own money, to be held intact with the petitioner's funds, and placed the same in the Fidelity Savings & Loan Society of Spokane, where they remained until 1928 or 1929, when she took the money out and invested it in Dexter Horton bank building bonds, which bonds on their face would draw seven per cent interest, such investment being made for the sole purpose of increasing the principal of the funds belonging to her ward; that thereafter the Dexter-Horton bank went into liquidation, and the bonds have little or no value at the present time; that the guardian had no knowledge that she was required to make a report or to get an order of court to change the investment; that, with the loss sustained on account of this investment, the guardian has lost her own in-

dividual funds, and at the present time has no funds belonging to the estate and no funds of her own.

The surety company filed an amended answer, in which it denied that any sum in excess of $770.63 came into the hands of the guardian, and denied that the guardian had failed to account, and that she now holds the sum of $1,305.63, or any other sum, for the benefit of petitioner. The answer affirmatively alleged that, in the year 1933, petitioner was married to a man of full legal age, and at the time of her marriage she became of full age and entitled to demand an accounting from her guardian; that petitioner's right of action, if any, accrued more than three years prior to the time this proceeding was instituted, and that this action is barred by the statute of limitations.

The surety company further alleged that Annie R. LeFevre, who is the grandmother of petitioner, long prior to the time this action was started, devised a scheme and plan for the purpose of casting on the surety burdens and obligations which should not be borne by it, and for the purpose of benefiting herself and petitioner. It is further alleged that petitioner has been guilty of laches.

Petitioner, by her reply, denied the affirmative matter contained in the answer of the surety. The guardian filed no formal appearance herein, other than her report.

The matter came on for hearing before the court on May 13, 1940, the guardian appearing in person, petitioner and the surety appearing by counsel; and the court, having heard the evidence, made and entered findings of fact, conclusions of law, and judgment in favor of petitioner and against Annie R. LeFevre and Fidelity & Deposit Company of Maryland, and each of them. The surety company alone has appealed from the judgment entered, and each and every part thereof.

Appellant claims the court erred in making and entering findings of fact Nos. 3, 5, 6, 7, 8, 9, 11, 12, 13, 14, and 15; in making and entering conclusions of law Nos. 1 and 3; and in entering judgment against the surety in any sum whatsoever. In view of the conclusion reached by us, it becomes unnecessary to pass upon the questions raised by appellant and respondent, other than those to which we shall hereinafter refer.

Respondent's father died in 1918, leaving a $1,500 life insurance policy, to the proceeds of which respondent became entitled. J. D. LeFevre, respondent's grandfather and husband of Annie R. LeFevre, was appointed respondent's guardian, and as such received and receipted for the $1,500 insurance money. Subsequent to his appointment, the guardian procured an order of court allowing him to expend the sum of twenty dollars per month for the care and support of the minor.

After the death of J. D. LeFevre, Annie R. LeFevre, executrix of his estate, filed a final account of the J. D. LeFevre guardianship, and it was adjudicated that there remained in the guardianship estate, after deducting certain support money made under order of court and some small items of expense, the sum of $770.63.

Annie R. LeFevre was appointed guardian of respondent, on or about March 12, 1923. Shortly prior to such appointment, Mrs. LeFevre adopted respondent as her daughter, and thereafter respondent continued to live with her grandmother, until she was about seventeen or eighteen years of age, when respondent began to earn her own living. At the time of respondent's adoption, her grandmother was apparently quite well to do, but she seems to have lost all her property, and for about two years prior to

respondent's becoming of age, her grandmother was on relief.

On November 25, 1933, respondent was married to Homer Drury, who was of full legal age. After about two years, she secured a divorce from Mr. Drury.

Respondent testified that she knew nothing about any guardianship proceedings until about 1936 or 1937, at which time she was working for Mr. McCrea, agent for Fidelity & Deposit Company, appellant herein, and happened to see in the files some papers with her name on them; that she inquired about the matter of Mr. McCrea, and he told her to come in when she was twenty-one years old and the bond would be taken care of, or words to that effect. Mr. McCrea denied making any such statement, and denied that he ever talked with respondent about this matter.

In the judgment entered herein, the guardian, Annie R. LeFevre, and appellant were charged with $770.63, being the balance on hand in the guardianship account at the time of the death of J. D. LeFevre, and they were also charged with the sum of $535, received from the estate of J. D. LeFevre by virtue of a specific bequest in his will, both of these items having been inventoried by Annie R. LeFevre, after her appointment, as money belonging to the minor.

Mrs. LeFevre testified that she never used one cent of this money for her own purposes, but that it was kept in the bank and held for respondent, until invested in the bonds. In her report the guardian did not ask for any compensation for herself, nor did she ask for any allowance for any court costs by her expended.

The court found there was no fraud or collusion shown between the guardian and the ward, and we are of the opinion the evidence does not preponderate against this finding.

Respondent raises a question which we feel

must be disposed of before we pass to a discussion of the case on the merits. Respondent contends that, because of the guardian's failure to prosecute an appeal in this case, and because the time for such an appeal has now expired and only the surety has appealed from the judgment entered, the judgment of the trial court has become final as to the guardian, and the final judgment against the guardian is conclusive against appellant on its bond obligation.

It may be admitted that we have held that a final judgment against a guardian is conclusive against the surety, in certain instances. *Goodwin v. American Surety Co.*, 190 Wash. 457, 68 P. (2d) 619. However, it does not appear to us that the instant case presents a situation to which this rule is applicable, because we do not believe that the judgment in this cause against the guardian is final and unappealed from, but rather it seems to us that the judgment is squarely presented for our consideration by the appeal taken by appellant.

Rem. Rev. Stat., § 1716 [P. C. § 7290], provides that:

"Any party aggrieved may appeal to the supreme court . . . from any and every of the following determinations . . . .

"(1) From the final judgment entered in any action or proceeding . . ."

Appellant is, of course, aggrieved by so much of the decree as adjudges it severally liable for the recovery granted in the lower court. Both in its individual capacity and as surety for the guardian, it is equally aggrieved by that portion of the decree adjudging the guardian severally liable and appellant and the guardian jointly liable. Because appellant's grievance is caused by the judgment below in its entirety, pursuant to § 1716, *supra*, an appeal may be taken by appellant to this court from that judgment in its whole aspect, and from each and every particular thereof, including

so much of that judgment as is made to run against the guardian, and for which appellant would be derivatively liable. Such is the form of the appeal taken herein.

It is further provided, by Rem. Rev. Stat., § 1731 [P. C. § 7316], that:

"Upon the taking of an appeal by notice as provided in this title, and the filing of a bond to render the appeal effectual, the supreme court shall acquire jurisdiction of the appeal for all necessary purposes . . ."

And Rem. Rev. Stat., § 1736 [P. C. § 7321], provides that:

"Upon an appeal from a judgment, the supreme court may review any intermediate order or determination of the court below which involves the merits and materially affects the judgment, appearing upon the record sent up from the superior court. . . ."

By Rem. Rev. Stat., § 1737 [P. C. § 7322], powers are granted to this court as follows:

"Upon an appeal from a judgment or order, or from two or more orders with or without the judgment, the supreme court may affirm, reverse or modify any such judgment or order appealed from, as to any or all of the parties, and may direct the proper judgment or order to be entered, or direct a new trial or further proceedings to be had . . ."

Reading §§ 1731, 1736, and 1737 together, it is evident that this court has jurisdiction and power for all necessary purposes of appeal, to review and correct any and all findings of fact and conclusions of law made by the court below, where error has been assigned because of the making and entering of any such finding of fact and conclusion of law.

Nor is this jurisdiction and power in any manner affected in this case by the guardian's failure to appeal, in so far as appellant's relief is concerned. There is no statutory provision by which such a party may be

forced to take an appeal; nor is there any provision limiting the power of this court to grant relief to which an appellant may be entitled because of a codefendant's failure or refusal to appeal.

Although the effect of this procedure may be to grant relief to a party who has not himself appealed from an adverse judgment of the superior court, where such relief is a necessary incident to the relief demanded by the merits of an appeal duly taken by a codefendant, such an incidental benefit to the non-appealing codefendant cannot be a valid reason for denying to appellant the full benefit of the relief to which he, in his individual right, is entitled. Such, we take it, is the intendment of the provision in Rem. Rev. Stat., § 1720 [P. C. § 7294], that

". . . any such party [parties whose interests are similarly affected by the judgment] who does not so join [in the appeal] shall not derive any benefit from the appeal *unless from the necessity of the case* . . ." (Italics ours.)

It appears to us that this is an instance where the "necessity of the case" is such that a benefit must be granted to the guardian even though the guardian has taken no appeal.

Appellant has undertaken, as a surety, to answer for certain defaults of the guardian. If a final judgment of the superior court, adjudicating such a default, is allowed to stand against the guardian, the court could absolve the surety from liability for that judgment only by rewriting the suretyship contract, and this the court has no right to do, where no objection to the terms of the contract as written is made by any party. Where the surety has introduced no valid personal defense, it would be a judicial anomaly to declare the suretyship contract valid as written, and yet to admit of a final judgment against the guardian on which no rights

accrue to the ward as against the guardian's surety. We recognize that *Morgan v. Williams*, 77 Wash. 343, 137 Pac. 476, seems to have sanctioned such a result, and we have discovered several cases from other jurisdictions in line with the *Morgan* case. But in the *Morgan* case and in the others referred to, the courts have not discussed, and apparently have given no consideration to, the question now before us.

In this connection, we call attention to *Mood v. Mood*, 171 Wash. 210, 18 P. (2d) 21, 23 P. (2d) 1118; *Goodwin v. American Surety Co., supra;* and *In re Deming*, 192 Wash. 190, 73 P. (2d) 764. In each of these guardianship cases, an appeal was prosecuted by the surety alone, after a judgment had been entered in the superior court against both the surety and the guardian. In none of them is it intimated that the surety is concluded, or in any way prejudiced, on the appeal because of the guardian's failure or refusal to appeal.

It is true that in no previous Washington case has this problem been expressly considered. Nevertheless, we are not inclined to treat lightly the established practice of this court to apply the rule relating to the conclusiveness of a judgment against a guardian, in an action against his surety, only to instances where the judgment is one procured in a separate action. We do not believe the rule should be applied under the present circumstances, where the only judgment against the guardian is that which was procured jointly and severally against the guardian and surety, in the very proceedings from which the surety has appealed. We must therefore hold respondent's contention cannot be sustained.

There is one question raised by appellant, which, if decided favorably to it, is determinative of this controversy, and must result in a reversal of the judgment and a dismissal of the action. Appellant contends that

the only theory of the lower court for holding the guardian and her surety liable herein is found in finding of fact No. 8, which reads:

"That during the year 1930 Annie R. LeFevre, the guardian herein, without order or authority of the Court, invested the funds and moneys of said minor in bonds of the Dexter Horton Bank Building of Seattle, Washington, taking and registering said bonds in her own name; *that said bonds are at the present time of little or no value*; that the Court further finds that while said investment was made without wrongful intent by said guardian that it was made without proper investigation and that said guardian did not exercise reasonable or ordinary prudence in the making of said investment." (Italics ours.)

There is no doubt in our minds that the trial court was of the opinion the claimed conversion took place and the funds of the ward were misappropriated at the time the guardian purchased the Dexter-Horton bonds and had them registered in her own name. The above finding is based upon the fact that the bonds were registered in the name of the guardian. Admitting that the taking of these bonds in the name of the guardian constituted a technical conversion or breach of trust, it does not follow that the guardian is liable to the ward other than for the actual loss suffered by virtue of such act, where the guardian acted in good faith.

Let us look briefly at this record. Annie LeFevre had the responsibility of the care and support of respondent for a good many years. She had such an affection for her granddaughter that she formally adopted her as her own daughter. It does not appear that, during all the years Norene lived with her grandmother, Annie LeFevre ever took one cent from the funds of the guardianship estate for her own use, or for the purpose of helping pay for the support and education of the minor. The grandmother bore all this expense herself,

although during the last few years she was in poor financial circumstances, being on relief for about two years prior to Norene's becoming of age. Not only did Mrs. LeFevre care for and support Norene, but, after respondent was married, she furnished the greater part of the support for both Norene and her husband.

In so far as this record shows, the money received by the guardian belonging to respondent was kept in the bank until about 1929 or 1930, at which time Annie LeFevre, being of the opinion that the ward's funds should be invested where they would draw more interest than in the bank, withdrew these funds and invested them, together with about seven hundred dollars of her own money, in the Dexter-Horton bonds. It does not appear that Mrs. LeFevre ever claimed the bonds as her own, but on the contrary we think the evidence conclusively shows that the guardian purchased the bonds and was at all times holding them as guardian for respondent, although the bonds, on their face, did not and do not so indicate.

It appears that in 1939 Mrs. LeFevre mortgaged her little home for $250, to raise some money principally for the purposes of assisting respondent to meet the necessary expense of going to business college in Seattle, and of paying some of respondent's bills incurred by her in Spokane. This check was made to respondent. Again, in January, 1940, Norene needed some more money, so she and her grandmother went to the Washington Trust Company, where they signed a joint note for about two hundred dollars, putting up two of the bonds as collateral. Norene received this money. This was after Norene had become twenty-one years of age.

The guardian has at all times had in her possession the original bonds, or the Dexter-Horton Building, Inc. registered income debentures, for which the original

bonds were exchanged in 1937, with the exception of those hereinbefore mentioned as pledged to the Washington Trust Company.

The cases are in apparent confusion upon the question of the measure of liability imposed upon a guardian who invests funds of the ward in the name of the guardian as an individual, without any indication of the trust character of the investment. The same confusion and the same considerations exist as to investments similarly made by trustees, and therefore, in our discussion of this question, the cases of trustees and of guardians will be treated together, without distinction.

On the one hand are many cases supporting the rule laid down in 28 C. J. 1144, § 243, that:

"If the guardian invests the ward's funds in his own name as an individual, he is liable for any loss that may result irrespective of any question of good faith or honest intention on his part."

Liability under this rule is not limited to such losses as may be caused by the guardian's act of taking the investment in his own name; but, rather, the breach of trust by the guardian who so invests the ward's funds is treated as having infected the entire investment in such a manner that the guardian is liable for any loss or depreciation, irrespective of its actual cause. A few of the cases setting forth this rule are: *In re Bane,* 120 Cal. 533, 52 Pac. 852, 65 Am. St. 197; *Hennies v. Keithly,* 213 Mo. App. 529, 255 S. W. 940; *In re Boschulte's Estate,* 130 Neb. 284, 264 N. W. 881; *Knowlton v. Bradley,* 17 N. H. 458, 43 Am. Dec. 609; *Stanley's Appeal,* 8 Pa. 431, 49 Am. Dec. 530; *Booth v. Wilkinson,* 78 Wis. 652, 47 N. W. 1128, 23 Am. St. 443.

On the other hand, and in line with our views to be presently expressed, are many recent cases holding that the guardian or trustee, who, in good faith, so invests the trust funds, has caused a breach of duty, but

that the liability for such breach should be limited to the damages actually caused by the breach. That is to say, a guardian, who, in good faith, takes in his own name securities purchased with funds of the ward, is not, for that sole reason, an absolute insurer of the funds so invested, but is liable to the ward for any loss to the ward's estate actually sustained by reason of failing to take title in such a manner as to indicate its trust character. Such a loss would be sustained were the guardian's personal creditors to reach the investment because of its being in the guardian's name, or were the ward, upon an accounting, to be unable to follow the *res* because of the commingling of the ward's estate with that of the guardian. For cases thus restricting liability to damages actually caused, see: *In re Cousins' Estate,* 111 Cal. 441, 44 Pac. 182 (1896); *Chapter House Circle, etc. v. Hartford Nat. Bank & Trust Co.,* 121 Conn. 558, 186 Atl. 543, 106 A. L. R. 260; *In re Deutsch's Guardianship,* 116 Neb. 591, 218 N. W. 380 (1928); *Rotzin v. Miller,* 134 Neb. 8, 277 N. W. 811 (1938); *In re Guthrie's Estate,* 320 Pa. 530, 182 Atl. 248, 103 A. L. R. 1186. See, also, 1 Restatement, Trusts, § 179, comment (d).

In at least two earlier cases, *Richardson v. State,* 55 Ind. 381 (1876), and *Brown v. Dunham,* 11 Gray 42 (Mass. 1858), it was held that the mere taking of an investment in the name of the guardian alone did not, *per se,* constitute a conversion. If by these decisions it was meant that no breach of trust, either technical or substantial, had been committed by the guardian, then we are not in accord with these holdings. But it seems to us rather that these decisions were forerunners to, and in support of, the doctrine subsequently announced in those cases cited immediately above.

The reasons for the rule of absolute liability quoted above from Corpus Juris are well expressed in the fol-

lowing statement appearing in *Chapter House Circle
etc. v. Hartford Nat. Bank & Trust Co., supra*:

"To guard against the temptation of the trustee to
take the security for himself and to substitute some-
thing of his own of less value in its place; to afford the
beneficiary the best means of tracing the property,
should it be necessary to do so; and to protect the bene-
ficiary against loss of the property or difficulty in as-
serting his rights to it should it be taken by creditors
of the trustee or pass into the hands of a purchaser."

There can be no doubt but that these are salutary
reasons for the rule, but it should be observed that
these reasons go only to the question of whether the
trustee's act amounts to a breach of trust; they do not
have any direct bearing upon the real question at issue,
namely:   Conceding that the act is a breach of trust,
what is the measure of damages to which the trustee
or guardian must respond?   It seems to us the courts
should not, in an overly zealous effort to protect the
ward's estate, neglect all consideration of the protec-
tion to which a guardian who has faithfully and con-
scientiously discharged his duty should be entitled.

It should be recognized that the rule of strict and
complete accountability is not intended to compensate
the ward for loss caused to his estate by the guardian's
act, but is rather a penalty provision intended to dis-
courage guardians from committing such acts which
endanger the ward's estate, irrespective of loss actu-
ally caused by the particular act.   It is, we think, per-
tinent to inquire how this purpose of the rule is in any
manner accomplished by the application of the rule to
the facts of the present case, where the guardian was
acting in unquestioned good faith throughout her
handling of the trust imposed by the guardianship,
where the funds of the ward are clearly traceable into
the investment, where no wrong was intended to the
ward, and where the depreciation in value of the ward's

estate would have occurred even though such breach of trust had not been committed. Nor would the application of the rule to this case in any manner affect the future conduct of other guardians situated similarly to the guardian in the present case, because the very premise of our present factual situation is that the guardian knew of no rule of conduct which she was violating, and was motivated by no ulterior purpose, but only by consideration for the best interests of her ward.

It seems to us that the rule imposing upon the guardian who has acted in good faith liability only for actual loss caused by the act of taking investments in the name of the guardian without indication of the trust character of the investment, affords ample protection to the ward's estate, and at the same time deals equitably with the faithful guardian. We are unable to see where, in balancing the interests of the ward and the guardian, and being mindful of the tenderness of the law toward wards, the policy of the law is subserved by a rule which holds the guardian accountable for a loss not occasioned by the guardian's breach of trust, and effects a pure windfall to the estate of the ward, because of a mere technical breach of duty by an otherwise faithful guardian.

It should be further observed that nothing said herein is intended to condone or abandon the rule holding that a guardian should not invest the ward's funds in the guardian's name as an individual. With that rule we are in entire accord. We only hold that, where a guardian has in good faith transgressed this rule, the liability imposed for such breach is limited to the actual damages caused by that breach.

In our opinion, there is nothing in the present case to indicate that respondent was damaged in any particular because the Dexter-Horton bonds were taken in

the name of "Annie R. LeFevre," instead of in the name of "Annie R. LeFevre, as guardian of Norene LeFevre." Therefore, pursuant to the rule announced above, and contrary to the rule of law applied by the trial court, respondent is not entitled to any recovery, either as against her guardian or as against appellant, for this technical breach of trust.

The other basis for liability upon which the trial court apparently relied was that the guardian had purchased these Dexter-Horton bonds without first having made a sufficient inquiry as to their being a proper investment.

In our opinion, it is completely immaterial in this case whether the evidence discloses a proper investigation preliminary to the investment, or an improper one, although we may say that we are of the opinion the evidence preponderates against this finding of the trial court.

It is true that a guardian must use proper care in making an investment of the ward's funds, and it is likewise true that, failing to make a proper investigation, the guardian is liable for resultant losses from the investment where a proper investigation would have disclosed that it was an improper trust investment. 2 Scott on Trusts (1939), 1201. But where the investment is proper, there is then nothing to be disclosed by the preliminary investigation, and therefore, in such a case, the failure to make this investigation cannot be said to cause any injury to the estate of the ward.

From this record it does not appear but that the Dexter-Horton bonds were a proper investment when purchased, and therefore there could be no liability caused solely by reason of any negligence in the guardian's preliminary inquiry. No evidence was introduced at the trial tending to show that the investment was improper when made, the only evidence being to

the effect that the bonds were of little value at or about the time of trial. The trial court did not find such impropriety, and it is not argued by respondent on this appeal that the investment was an improper one for the guardian to make. That was not the theory of respondent's claim herein. On this record it is certainly not within the province of this court to presume, because those bonds subsequently declined in value, as did so many other good securities during the recent financial depression, that they were inadequately secured, or were sold to the guardian at an inflated value, or that the investment when made was in any other particular improper. The matter not being contested by respondent, and the investment appearing proper upon its face, we must assume that the investment was a proper one to be made with guardianship funds.

For the reasons herein assigned, the judgment of the trial court must be and is reversed, and the cause remanded, with instructions to the trial court to enter a judgment dismissing this action as to appellant, approving the account and report of the guardian as filed, and ordering the guardian to distribute the guardianship estate to respondent, subject, however, to such liens as may now exist against any of the property, and further ordering that the guardian do any and all necessary acts to accomplish such distribution.

ROBINSON, C. J., BEALS, and SIMPSON, JJ., concur.

MILLARD, J. (dissenting)—I subscribe to the rule that if a guardian invests the ward's funds in his own name as an individual, he is liable for any resultant loss, irrespective of the good faith or honest intention of the guardian.

The judgment should be affirmed.