694

[No. 57314-4-I.   Division One.   May 21, 2007.]

GENIE INDUSTRIES, INC., *Appellant,* v. MARKET TRANSPORT, LTD., *Defendant,* SYSTEM TRANSPORT, INC., *Respondent.*

*Nicholas P. Gellert, Marie G. Aglion, John D. Dillow,* and *John S. Rossiter, Jr.,* (of *Perkins Coie, LLP*), for appellant.

*David M. Jacobi* (of *Wilson Smith Cochran Dickerson*), for defendant Market Transport, Ltd.

*John R. Ruhl* (of *Eisenhower & Carlson, PLLC*) and *Charles K. Wiggins* (of *Wiggins & Masters, PLLC*), for respondent System Transport, Inc.

¶1 BECKER, J. — An indemnity clause in a transportation agreement is before us for interpretation under Oregon law. The question is whether System Transport, Inc., a trucking company, agreed to indemnify Market Transport, Ltd., and its customers for losses caused by their own negligence. The trial court concluded the indemnity clause did not express

that intention and entered summary judgment dismissing the claims of the indemnitees. We disagree and reverse the order of summary judgment as to appellant Genie Industries, Inc. We decline to grant the same relief to Market Transport. Although Market Transport's claim for indemnity arose under the same contract language that applies to Genie, Market did not file its own notice of appeal and there are no "necessities of the case" that permit Market to join Genie's appeal belatedly under RAP 5.3(i).

## FACTS

¶2 Appellant Genie Industries, Inc., is a company based in Moses Lake, Washington. Genie manufactures and sells industrial lifting equipment. Genie hired Market Transport, Ltd., to coordinate the delivery of Genie's lifts to purchasers. Their agreement is known as the "Logistics Management Agreement." Market's responsibilities included evaluating and selecting trucking companies to carry Genie's products. Market selected respondent System Transport, Inc., to transport the lifts involved in this case. System is one of Market's "core" carriers. The agreement between Market and System is known as the "Master Transportation Services Agreement." Under this agreement, System frequently handled Genie's lifts.

¶3 Market arranged for System to haul two Genie lifts from Washington to North Carolina in 2001. The lifts were loaded onto a flatbed trailer with the heavy base units at the center and the baskets facing outward, one toward the front and one toward the back. Later, a dispute would arise about whether a different mode of transportation should have been chosen, whether the base units should have been placed over the axles, and who was responsible for directing the configuration of the load.

¶4 After the lifts were on the trailer, System's driver secured the lifts with chains and started out. Right away he noticed that the load seemed unstable. He stopped at System's Spokane facility to check on it, but upon leaving Spokane he found that the load continued to lean in an

unsettling manner during turns. Although he alerted his dispatcher that the problem persisted, System allowed him to continue on without further inspection.

¶5 While the truck was passing through Indiana on the interstate, the Genie lifts broke free from the trailer. Nearby, Allen and Mary Pierce were on the side of the road, fixing a flat tire. One of the lifts hit Mr. Pierce and severed his leg. The other smashed into the Pierce family car. The car ignited. The Pierces' young son, trapped inside, died in the fire.

¶6 The Pierce family sued System, Genie, and Market for damages caused by the accident, alleging that each defendant was negligent. The Pierce claims were litigated in a federal district court in Illinois. The court declared in April 2002 that Indiana law applied to all the Pierce claims. Because Indiana does not have joint and several liability, each defendant would be responsible to the Pierces only for damages caused by its own negligence.

¶7 The Pierces alleged, among other theories, that System, Genie, and Market were each negligent for failing to ensure that the load was adequately secured. These allegations remained after various motions for summary judgment were decided. Before trial, the Pierces settled with the three defendants for a total of $15.6 million. System contributed $7.6 million; Genie, $4 million; and Market, $4 million.

¶8 Meanwhile, Genie filed this lawsuit in King County Superior Court in January 2005, asking for indemnity from both Market and System. Genie's claim against Market was based on an indemnity provision in the Logistics Management Agreement. The court dismissed Genie's indemnity claim against Market in an order of summary judgment dated September 23, 2005.

¶9 Genie's claim against System was based on a similar indemnity provision in the Master Transportation Services Agreement. By signing the agreement, System agreed to indemnify, defend, and hold harmless Market and its cus-

tomers for costs "arising out of or related to, directly or indirectly,"[1] System's performance of the agreement. As Market's customer, Genie was a third party beneficiary of this agreement. Market cross-claimed against System for indemnity based on the same agreement.

¶10 System moved for summary judgment against Genie's claim and Market's cross-claim. System's motion was based on the principle that indemnitees are not covered for their own negligence unless the indemnity agreement clearly and unequivocally expresses that intent.[2]

¶11 Genie opposed the motion. Market did not oppose the motion. Market responded that System's motion for summary judgment logically should have the same outcome as Market's earlier motion because the indemnity provisions in the two agreements had similar wording. Market took the position, however, that if Genie's claim against System did survive the motion for summary judgment, then "Market's cross-claim against System also must survive."[3] In an order dated October 28, 2005, the trial court granted System's motion for summary judgment and dismissed the claims by Genie and Market for indemnity based on the Master Transportation Services Agreement.

¶12 Genie filed a notice of appeal from both orders. But by the time Genie filed its brief of appellant in May 2006, Genie had settled with Market and had dropped its appeal of the September 23 order that dismissed Genie's claim for indemnity from Market. Thus the only issue raised by Genie's brief was whether the trial court, in its October 28 order, had improperly dismissed Genie's claim of indemnity from System.

¶13 Market did not file a notice of appeal concerning the dismissal (by the same order) of its cross-claim against System. Three months after Genie filed its brief of appel-

---

[1] Clerk's Papers at 66 (Master Transp. Servs. Agreement).

[2] Clerk's Papers at 872.

[3] Clerk's Papers at 860.

lant, however, Market filed a "Joinder" in that brief. Market contends that if this court reinstates Genie's claim for indemnity from System, then Market's claim against System must also be reinstated because both Market and Genie derive their status as indemnitees from the same provision in the Master Transportation Services Agreement. System has moved to strike the joinder and bar Market from obtaining any relief on appeal.

¶14 We first analyze the indemnity provision to decide whether Genie is entitled to relief from the order of October 28, 2005. If so, we must then decide whether reversal of the judgment against Genie compels reversal of the judgment against Market.

## CONTRACTUAL INDEMNITY

¶15 "The standard of review of an order of summary judgment is de novo, and the appellate court performs the same inquiry as the trial court." *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). "Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Sheehan v. Cent. Puget Sound Reg'l Transit Auth.*, 155 Wn.2d 790, 797, 123 P.3d 88 (2005).

¶16 The Master Transportation Services Agreement between System and Market contains the following indemnity provision:

> *INDEMNIFICATION*. Carrier [System] agrees to indemnify, defend and hold MTL [Market] and its Customer [Genie] (including their officers, directors, employees, subcontractors and agents) harmless from and against any and all liabilities, damage, fines, penalties, costs, claims, demands and expenses of whatever type or nature, to any person arising out of or related to, directly or indirectly: (i) any action or omission by Carrier, its agents, employees or subcontractors; (ii) any claims or actions by Carrier's agents, employees or subcontractors; (iii) the failure of Carrier, its agents, employees or subcontrac-

tors to comply with this Agreement, Transportation Schedules, or any applicable United States or Canadian federal, provincial, state or local law, statute, regulation, rule, ordinance, or government directive which may directly or indirectly regulate or affect the obligations of Carrier under this Agreement or the Transportation Schedules; or, (iv) Carrier or Carrier's agents, employees or subcontractors, performance of this Agreement or any Transportation Schedule. The obligations of Carrier under this Section shall survive the termination of this Agreement and any Transportation Schedule.[4]

The agreement is governed by Oregon law. Under Oregon law, a private party "may legally contract for indemnification against the consequences of its own negligence not criminal or wanton in nature." *S. Pac. Co. v. Morrison-Knudsen Co.*, 216 Or. 398, 419, 338 P.2d 665 (1959). However, Oregon also follows the rule that indemnity agreements generally "will not be construed to cover losses to the indemnitee caused by his own negligence unless such intention is expressed in clear and unequivocal terms." *S. Pac. Co. v. Layman*, 173 Or. 275, 279, 145 P.2d 295 (1944).

¶17 The rule requiring clear and unequivocal expression "has been applied varyingly depending on the terms of the contracts and the nature of the parties involved." *Morrison-Knudsen Co.*, 216 Or. at 410. It does not depend upon the use of particular words of intention. " 'By the overwhelming weight of authority, something less than an express reference in the contract to losses from the indemnitee's negligence as indemnifiable will suffice to make them so *if the intent otherwise sufficiently appears from language and circumstances.*' " *Morrison-Knudsen Co.*, 216 Or. at 417 (emphasis added) (quoting *Stern v. Larocca*, 49 N.J. Super. 496, 503-04, 140 A.2d 403 (1958)).

¶18 In *Layman*, the Southern Pacific railroad allowed Layman, a farmer, to construct and maintain a private crossing over the tracks. Layman signed a contract with the railroad with a broad indemnity clause in which he agreed

---

[4] Clerk's Papers at 66 (Master Transp. Servs. Agreement).

to hold the railroad harmless from liability resulting from the presence or use of the crossing he had built: " 'Licensee shall and hereby expressly agrees to indemnify and save harmless the Licensor and its lessor from and against any and all loss, damage, injury, cost and expense of every kind and nature, from any cause whatsoever, resulting directly or indirectly from the maintenance, presence or use of said crossing.' " *Layman*, 173 Or. at 276-77. Years later, a train negligently struck and "practically demolished" a truck going over Layman's crossing. *Layman*, 173 Or. at 278. After paying the injured party, the railroad sought indemnity from Layman. The trial court decision dismissing the railroad's suit was affirmed on appeal. The court acknowledged that the language of the indemnity clause was "undoubtedly broad and general enough to include loss caused solely by the plaintiff's negligence," but it would be "unreasonable" to interpret it so broadly because of the harshness of the result—subjecting a farmer to a potentially "ruinous liability" arising out of the railroad's negligence in the operation of its trains, an operation over which the farmer had no control. *Layman*, 173 Or. at 281, 283. "We do not believe that for the mere privilege of passing over the plaintiff's tracks the defendant intended to assume such a risk, or that the railway company intended to impose it." *Layman*, 173 Or. at 283.

¶19 *Layman* shows that when broad language of indemnity is used, the interpretation will depend on circumstances such as who had control of the risk and how much benefit the indemnitor gained from the underlying contract. *See Layman*, 173 Or. at 283-84. When indemnity provisions appear in agreements having a primary purpose other than indemnity itself, they "are viewed as realistic attempts to allocate business risks among the parties and should be given a reasonable construction." *Cook v. S. Pac. Transp. Co.*, 50 Or. App. 547, 551, 623 P.2d 1125 (1981). They will not be construed as extending to the negligence of the indemnitee "unless a contrary intention clearly appears, expressly *or out of the circumstances of the parties and their*

*relationship." Cook*, 50 Or. App. at 551 (emphasis added) (citation omitted).

¶20 System first contends the indemnity language at issue here is not, to use *Layman*'s terminology, "broad and general enough to include loss caused solely by the plaintiff's negligence." System contends the broad phrase "any and all liabilities" is actually narrow because it is tied down to liabilities arising out of specified risks, i.e., the risks associated with System's acts, omissions, and performance of the agreement. This argument is not persuasive because Oregon courts have found similar language of indemnity broad enough to be subject to interpretation. *See, e.g.*, the indemnity in *Morrison-Knudsen Co.*, 216 Or. at 401 (" 'from all liability, cost and expense resulting directly or indirectly from the presence or use of said bunker' "); *Cook*, 50 Or. App. at 550 (" 'from and against all liability, cost and expense arising out of or in connection with the work to be performed by Buyer' "). System suggests that such cases are distinguishable because they are concerned with liabilities arising from use or maintenance of premises. System does not cite authority identifying a distinction based on premises liability as material and has offered no reason why it should be.

¶21 System contends its promise of indemnity in the Master Transportation Services Agreement is unambiguously limited to liabilities created by System's own actions or omissions, and it therefore excludes liability created by the negligence of Market or its customers. This argument is contrary to the plain language of the indemnity provision. System agreed to defend and indemnify Market and its customers against any and all liabilities "arising out of or related to, directly or indirectly," any action or omission by System or performance by System. Genie incurred liability to the Pierces for the negligence of Genie employees who were involved in loading the lifts onto the truck. Genie's liability is at least indirectly related to System's conduct during the loading and transport of the lifts. If System had adequately secured the load during the cross-country journey, Genie's liability to the Pierces would not have arisen.

¶22 In short, the indemnity is phrased in language broad and general enough to include the portion of the Pierces' damages caused solely by Genie's negligence. The question, then, is whether interpreting it so broadly is unreasonable under the circumstances because of the potential for harsh results.

¶23 As shown by the present record, the circumstances of this case are on a spectrum between *Morrison-Knudsen Co.* and *Layman*. In *Morrison-Knudsen Co.*, a railroad was allowed to enforce a contractual right to indemnity for damages caused by its own negligence. In exchange for a broad promise of indemnity, the railroad had permitted private corporations (Industry) to build and maintain a bunker on a spur track to facilitate the unloading of cars carrying cement for the Industry's use in a construction project. An Industry employee climbed onto a railroad car while trying to keep it from getting stuck in the housing of the bunker. When the train jerked, he fell and was injured. He sued the railroad for negligence and received a judgment. The railroad sued the Industry for indemnity. After a bench trial, judgment was entered in favor of the railroad. The trial court concluded that the parties intended for the railroad to be indemnified for liability resulting from the presence or use of the bunker even when the railroad's own negligence was a cause of the loss.

¶24 The Oregon Supreme Court affirmed, following the reasoning of *Layman*. Under *Layman*, the prime consideration was the avoidance of "harsh results." Three factors influencing the analysis in *Layman* were: "(1) the relative status of the parties, particularly, in a financial sense; (2) the relative scope of the privilege accorded Layman; and (3) the degree of additional liability assumed by the Railroad by reason of the privilege conferred on the indemnitor." *Morrison-Knudsen Co.*, 216 Or. at 412 (citing *Layman*, 173 Or. at 280). Evaluating these factors in the context of the bunker, the court found "no conditions which would result in harshness as to the indemnitor-Industry." *Morrison-Knudsen Co.*, 216 Or. at 418. First, the Industry was large

and well established. Second, the privilege of building and using the bunker was an accommodation to the Industry, with no comparable compensating advantage to the railroad. And third, the bunker, a large structure built over and under the tracks, created new risks and hazards that were not usual to the railroad's ordinary operation. *Morrison-Knudsen Co.*, 216 Or. at 412-13. Accordingly, the court concluded, "the conditions which warranted the limitations applied in the *Layman* case do not exist." *Morrison-Knudsen Co.*, 216 Or. at 418.

¶25 Here, the interpretation of System's promise of indemnity was resolved on summary judgment and the facts in the record bearing on the harshness analysis must be viewed in the light most favorable to Genie, the non-moving party below. The question is what was intended by Market and System, the contracting parties. First, in terms of their relative status, the record does not support System's effort to depict itself as weak and financially vulnerable like the farmer in *Layman*. System has been in the trucking business since at least 1993. When applying to be a core carrier for Market, System reported that the company had over 500 trucks in its fleet and transported goods to nearly every state in the nation and to Canada.[5] It is unlikely System was too unsophisticated to perceive the exposure inherent in such a broad and unlimited promise of indemnity.

¶26 Second, the scope of System's privilege was extensive, unlike in *Layman* where the farmer's use of the crossing was "occasional and relatively unimportant." *Morrison-Knudsen Co.*, 216 Or. at 413. By signing the agreement, System obtained regular business as a hauler for Genie's products. We cannot say as a matter of law that it would have been unreasonable for System to agree to assume the risks of carrying cargo for Market's customers in exchange for the right to be a core carrier.

---

[5] Clerk's Papers at 830 (System's Logistics Carrier Profile).

¶27 As to the third factor, the question is whether the agreement created new risks and hazards for Market's customers that were not usual to their ordinary operation. Genie argues that the arrangement with System exposed Genie to risks of carriage that are not part of Genie's ordinary business. System responds that Genie's need to move its lifts across the country inherently exposes Genie to the risk of an accident while the cargo is in transit.

¶28 Even if all the factors do not weigh decisively in favor of Genie, what is important is that on this record they do not weigh decisively in favor of System. A fact finder, after examining the circumstances and relationship between the contracting parties shown by this record, could decide that the indemnity provision was indeed intended to be unlimited in scope. If so, then System will have to indemnify Genie for Genie's liability to the Pierce family.

¶29 System alternatively argues that the indemnity provision is simply inapplicable to Genie's liability in this particular instance because there is no joint and several liability under Indiana law and, consequently, System can be liable only for its own negligent acts or omissions, not for Genie's. But Indiana law on allocation of fault is irrelevant to the interpretation of the Master Transportation Services Agreement, which is governed by Oregon contract law. Under Indiana tort law, System is liable *to the Pierces* only for its own conduct. This does not negate any contract liability System may have *to Genie* to cover Genie's liability to the Pierces. *See generally Morrison-Knudsen Co.*, 216 Or. at 403-09 (contract doctrines, not tort principles, control scope of indemnity).

¶30 The trial court erred in dismissing Genie's claim against System.

## JOINDER

¶31 Given our decision to reinstate Genie's indemnity claim against System, we must now decide whether Market is likewise entitled to relief from the judgment of dismissal.

¶32 Market did not file a notice of appeal. Ordinarily, a party must file a timely notice of appeal to be entitled to relief. In exceptional circumstances, an appellate court may grant affirmative relief to a party who did not file a notice of appeal because relief is demanded by the necessities of the case. RAP 2.4(a)(1), 5.3(i).

¶33 When it is a respondent who requests affirmative relief without having filed a cross-appeal, RAP 2.4(a)(1) is the applicable rule. Market and System were both designated respondents to Genie's appeal at the time it was filed. RAP 3.4. As a result of the settlement between Genie and Market, Market is no longer adverse to Genie on review and therefore can no longer be considered a respondent. By filing its notice of "Joinder," Market is attempting to realign itself on Genie's side as an appellant. This effort must be judged under RAP 5.3(i):

> **Notice by Fewer Than All Parties on a Side—Joinder.** If there are multiple parties on a side of a case and fewer than all of the parties on that side of the case timely file a notice of appeal or notice for discretionary review, the appellate court will grant relief only (1) to a party who has timely filed a notice, (2) to a party who has been joined as provided in this section or (3) to a party if demanded by the necessities of the case. The appellate court will permit the joinder on review of a party who did not give notice only if the party's rights or duties are derived through the rights or duties of a party who timely filed a notice or if the party's rights or duties are dependent upon the appellate court determination of the rights or duties of a party who timely filed a notice.

¶34 Market says its right to indemnity from System is "derived through" or "dependent upon" this court's determination of Genie's right to indemnity. Market reads RAP 5.3(i) as providing for permissive joinder on appeal whenever multiple parties derive their rights from a single source, such as the same contract. Market contends that the "necessities of the case" and "common sense" require

that all such parties should be on an equal footing to avoid "inconsistent and absurd results."[6]

**[4-6]** ¶35 RAP 5.3(i) is not often invoked. The task force comment indicates that the rule is intended to codify case law:

> The phrase "necessity of the case" has become a term of art and is retained. See Mon Wai v. Parks, 46 Wn.2d 138, 278 P.2d 676 (1955). This rule also permits the joinder of a party under the specified circumstances so that relief may be granted to that party. For example, a surety should appropriately have the benefit of a decision on review in favor of the surety's principal.

2A KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE RAP 5.3, task force cmt. at 479 (6th ed. 2004). *Washington Practice* observes that the mechanics of joinder "are not as explicit as might be desired" but nevertheless recommends that even if the absent party did not formally request permission to be joined, "the rule should be liberally construed to allow the court to grant relief under the circumstances described in the case law." 2A TEGLAND, *supra*, RAP 5.3 author's cmt. 10, at 477, 478. *Washington Practice* also cautions that the rule as drafted "may not accurately capture the case law that preceded it." 2A TEGLAND, *supra*, RAP 5.3, author's cmt. 10, at 478.

¶36 Following the direction given by *Washington Practice*, we assign no significance to the fact that Market simply filed a pleading titled "Joinder of Market Transport, Ltd. in Brief of Appellant" rather than formally moving for permission to join. Instead we focus on the case law that preceded the adoption of the rule. In more than 60 years the Supreme Court has only twice, in narrow and unusual circumstances, invoked the "necessity of the case" to allow a party who did not file a notice of appeal to be joined with an appellant who did: *In re Guardianship of LeFevre*, 9 Wn.2d 145, 113 P.2d 1014 (1941) and *Mon Wai*, 46 Wn.2d 138. In each case, a trial court had entered judgment against codefendants who had joint rights or duties concerning the same sum of money, and only one of them

---

[6] Market's Br. in Opp'n to System's Mot. to Strike at 4 (July 24, 2006).

appealed. In each case the defendant who appealed achieved reversal on appeal, but by operation of law the reversal would not change the status quo as to the respondent unless the appellate court made the reversal effective in favor of the defendant who did not appeal as well as the defendant who did. Market's situation does not fit within this template.

¶37 A preliminary case in which joinder was *not* allowed is *Morgan v. Williams*, 77 Wash. 343, 137 P. 476 (1914). The plaintiff sued a sheriff and his surety to recover damages for an alleged false return of service filed by the sheriff in the plaintiff's divorce case. A jury returned a verdict of $1,700, and judgment was entered against both defendants. The surety appealed; the sheriff did not. The Supreme Court held plaintiff's appropriate remedy was against her former husband, not the sheriff, and remanded with instructions to enter judgment in favor of the surety. Seeing that the surety had prevailed on appeal, the sheriff moved to set aside the judgment as to him personally. The trial court's order denying this motion was affirmed. The Supreme Court rejected the notion that the sheriff was entitled to relief based on the "necessity of the case":

> We are not impressed with the appellant's contention that he must "from the necessity of the case," profit by the successful appeal of his codefendant in which he did not join, under the provisions of Rem. & Bal. Code, § 1720 (P. C. 81 § 1191). That section provides, in effect, that any party who does not join in the appeal, nor prosecute an independent appeal, from a final judgment shall not derive any benefit from the appeal unless from the necessity of the case. The necessity of the case contemplated by that statute is an absolute necessity; that is to say, one arising from the inherent nature of the case in that no judgment rendered could, under any circumstances, be valid as to one of the parties and not as to the others. Obviously, this is

not such a case. We find no error in the refusal of the trial court to vacate the judgment.

*Morgan*, 77 Wash. at 347.[7]

¶38 The first case to allow joinder based on "the necessity of the case" was *LeFevre*, 9 Wn.2d at 153. In 1923, Annie LeFevre became the guardian of her young granddaughter, Norene LeFevre. Annie was bonded by a surety company. Having received $1,305.63 on behalf of Norene, Annie invested it in bank bonds. During the Depression the bonds lost their value. When Norene came of age, she filed a petition to require Annie to render an accounting and to turn over the sum of $1,305.63. Annie's answer disclosed that she no longer had any money. Annie's surety company, notified of the petition, appeared and answered. The trial court found that Annie had committed a conversion. The court entered judgment for $1,305.63 in favor of Norene against Annie and the surety. The surety company appealed; Annie did not. The Supreme Court reversed the judgment, finding no evidence of conversion.

¶39 Norene argued that the surety still had to pay the judgment despite having been relieved from it on appeal because the same judgment became final against Annie (who did not appeal), and a final judgment against a guardian is conclusive against the guardian's surety. The court acknowledged that *Morgan* provided some support for

---

[7] *Morgan*, 77 Wash. 343, refers to Rem. & Bal. Code § 1720, a former statute governing joinder on appeal. That statute and its successor, RCW 4.88.040 (likewise now repealed), provided as follows:

> All parties whose interests are similarly affected by any judgment or order appealed from may join in the notice of appeal whether it be given at the time when such judgment or order is rendered or made, or subsequently; and any such party who has not joined in the notice may at any time within ten days after the notice is given or served, serve an independent notice of like appeal, or join in the appeal already taken by filing with the clerk of the superior court a statement that he joins therein or in some part thereof, specifying in what part. *Any such party who does not so join shall not derive any benefit from the appeal unless from the necessity of the case;* nor can he independently appeal from any judgment or order already appealed from, more than ten days after service upon him of written notice of the former appeal, unless such former appeal be afterwards dismissed.

(Emphasis added.) This statute is also discussed in *Mon Wai*, 46 Wn.2d at 139-40.

Norene's argument but refused to treat the judgment against the guardian as final (as it would have been under *Morgan*) when that would mean depriving the surety of the benefit of its successful appeal.

> It may be admitted that we have held that a final judgment against a guardian is conclusive against the surety, in certain instances. However, it does not appear to us that the instant case presents a situation to which this rule is applicable, because we do not believe that the judgment in this cause against the guardian is final and unappealed from, but rather it seems to us that the judgment is squarely presented for our consideration by the appeal taken by appellant.
>
> . . . .
>
> Although the effect of this procedure may be to grant relief to a party who has not himself appealed from an adverse judgment of the superior court, *where such relief is a necessary incident to the relief demanded by the merits of an appeal duly taken by a codefendant, such an incidental benefit to the non-appealing codefendant cannot be a valid reason for denying to appellant the full benefit of the relief to which he, in his individual right, is entitled.* . . .
>
> It appears to us that this is an instance where the "necessity of the case" is such that a benefit must be granted to the guardian even though the guardian has taken no appeal.

*LeFevre*, 9 Wn.2d at 151, 153 (emphasis added) (citations omitted).

¶40 The court further explained that letting the judgment stand as final against the guardian while relieving the surety would create a "judicial anomaly" because it would imply that the court had improperly rewritten the suretyship contract:

> Appellant has undertaken, as a surety, to answer for certain defaults of the guardian. If a final judgment of the superior court, adjudicating such a default, is allowed to stand against the guardian, the court could absolve the surety from liability for that judgment only by rewriting the suretyship contract, and this the court has no right to do, where no objection to the terms of the contract as written is made by any party. Where the surety has introduced no valid personal defense, it would be

a judicial anomaly to declare the suretyship contract valid as written, and yet to admit of a final judgment against the guardian on which no rights accrue to the ward as against the guardian's surety.

*LeFevre*, 9 Wn.2d at 153-54. In order to preserve the integrity of suretyship law while preserving the surety's appellate victory, it was necessary for the court to deem the guardian to be joined in the surety's appeal, treat the judgment against the guardian as a decision presented for review, and reverse it. Relief from the judgment was merely an incidental benefit to the guardian, who was penniless.

¶41 *LeFevre* does not overrule *Morgan*, and it does not stake out an avenue of necessity broad enough to include Market. In *LeFevre*, the surety's obligation to the ward was derived through and dependent upon the guardian's obligation to the ward. System's obligation to Genie is not similarly derived through or dependent upon any obligation Market has to Genie. System's obligations to Market and Genie are independent of each other. Allowing Genie but not Market to get indemnity from System does not imply that the court has improperly rewritten the indemnity contract. It simply recognizes that System's judgment against Market became final while System's judgment against Genie did not.

¶42 The second case to allow joinder of a nonappealing party, and the one primarily relied upon by Market, is *Mon Wai*, 46 Wn.2d 138. We shall refer to it as *Mon Wai II* because it was the second of three decisions arising from the same underlying transaction, a lease for the operation of a gas station in Yakima.

¶43 For background, the essential facts are found in *Mon Wai v. Parks*, 43 Wn.2d 562, 262 P.2d 196 (1953) (*Mon Wai I*). Parks and Watkins leased the property from Mon Wai for a term of 10 years beginning in July 1949. Parks then sold his interest to Watkins in exchange for Watkins' agreement to pay the rent and perform all conditions of the lease. Two years later, Watkins stopped paying the rent. Three months later, Mon Wai regained possession of the property. Mon

Wai sued Parks and Watkins for three months of unpaid rent amounting to $1,215. Watkins answered, denying liability for the unpaid rent. Parks answered, asking for judgment against Watkins if Mon Wai prevailed.

¶44 Mon Wai did prevail in the trial court. He obtained a judgment against both Parks and Watkins for $1,215. The court also entered judgment for Parks against Watkins, who had assumed Parks' obligations under the lease. *Mon Wai* I, 43 Wn.2d at 563-65.

¶45 Watkins appealed and was successful. As the Supreme Court interpreted the lease, Mon Wai was not entitled to the unpaid rent because of a liquidated damages clause in the lease. The court disposed of the case by reversing Mon Wai's judgment, but only as against Watkins. The court noted that Parks was not a party to the appeal. *Mon Wai* I, 43 Wn.2d at 569.

¶46 Earlier, Parks had satisfied the original judgment by paying Mon Wai. *Mon Wai* I, 43 Wn.2d at 569. Parks then recovered from Watkins. *Mon Wai* II, 46 Wn.2d at 139. After success on appeal, Watkins obtained a writ of execution and was able to get his money back from Parks. After paying Watkins back, Parks moved for a writ of execution to get his money back from Mon Wai. The trial court denied this motion, setting up the appeal by Parks in *Mon Wai* II.

¶47 Mon Wai took the position that Parks could not recover the money because he was not a party to the first appeal that reversed Mon Wai's judgment. *Mon Wai* II, 46 Wn.2d at 139. The governing statute would not allow Parks to benefit from Watkins' appeal " 'unless from the necessity of the case.' " *Mon Wai* II, 46 Wn.2d at 140 (emphasis omitted) (quoting former RCW 4.88.040 (1893)).[8] The Supreme Court looked to *Morgan* for the meaning of that phrase: " 'The necessity of the case contemplated by that statute is an absolute necessity; that is to say, one arising from the inherent nature of the case in that *no judgment rendered could, under any circumstances, be valid as to one*

---

[8] *See supra* note 7.

714

*of the parties and not as to the others.' " Mon Wai* II, 46 Wn.2d at 140 (quoting *Morgan*, 77 Wash. at 347). The original judgment in favor of Mon Wai fit this description because the rights of Parks and Watkins under the lease were not separable:

> Mon Wai, as lessor, sued Parks and Watkins, as lessees, whose names were both affixed to the lease. Parks and Watkins answered separately. Mon Wai asserted no greater or additional right to recover against either of the defendants than he did against the other. Neither defendant asserted any defense which, if upheld, would not have been a defense as to both defendants. In view of these facts, no judgment could, under any circumstances, have been valid as to one of the defendants and not as to the other. Accordingly, the trial court, having found that Mon Wai was entitled to recover, entered judgment against both defendants.

*Mon Wai* II, 46 Wn.2d at 141. The court concluded that Parks, despite his failure to appeal Mon Wai's judgment, should by necessity of the case be allowed to get the money back from Mon Wai.

¶48 Here, Market claims to be in the same position as Parks because the judgment System obtained in the trial court deprived both Genie and Market of a claim to indemnity based upon an interpretation of the same language of the same contract. Market's situation, however, is unlike the situation of Parks on certain critical points. The judgment entered in favor of Mon Wai imposed joint liability *for the same sum of money* upon the party who appealed it (Watkins) and the party who did not (Parks). If the court had allowed the judgment against Parks to stand, Mon Wai would end up keeping the $1,215 even though the decision in *Mon Wai* I held he was not entitled to it—a legally anomalous result. In *Mon Wai* II, just as in *LeFevre*, the Supreme Court found it necessary to avoid the anomalous result by making the reversal of the original judgment effective as to the nonappealing party. *See Mon Wai v. Parks*, 48 Wn.2d 507, 510, 294 P.2d 931 (1956) (*Mon Wai* III).

¶49 Between Genie (who appealed) and Market (who did not), there is no joint right or joint obligation concerning the

same sum of money. Each of them has an independent dispute with System over a different sum of money. *Cf. Norton v. McIntosh*, 1 Wn. App. 334, 338, 461 P.2d 348 (1969) (benefit received on appeal by a respondent who did not cross-appeal was "the unavoidable result of the interdependent and intermingled nature" of the parties' claims to the same $1,000 payment). What Genie has achieved on appeal is the right to seek indemnity from System for the $4 million Genie has paid to the Pierces. That success can be fully realized without relieving Market from the judgment of dismissal. Market is not like Parks, and therefore *Mon Wai* II does not compel joinder of Market.

¶50 Market argues that RAP 5.3(i) should not become a trap for the unwary. Market cites RAP 1.2(a): "These rules will be liberally interpreted to promote justice and facilitate the decision of cases on the merits. Cases and issues will not be determined on the basis of compliance or noncompliance with these rules except in compelling circumstances where justice demands, subject to the restrictions in rule 18.8(b)." While reaching the merits is indeed a strong policy, so is repose. It must be remembered that one of the most important services the courts provide is to bring legal disputes to an end. There are a variety of reasons why one party may choose to press an appeal while a similarly situated party decides to abide by the result at trial. Allowing Market a free ride to the appellate court on Genie's coattails would create a precedent undermining the finality of many judgments.

¶51 The well-known 30-day deadline for filing a notice of appeal in RAP 5.2(a) serves the finality of judgments and cannot be disparaged as a trap for the unwary. Rule 18.8(b) provides that the requirement to file a notice of appeal within a specified time will be extended only in extraordinary circumstances and to prevent a gross miscarriage of justice. "The appellate court will ordinarily hold that the desirability of finality of decisions outweighs the privilege of a litigant to obtain an extension of time under this section." RAP 18.8(b). RAP 18.8(b) underscores the reasons

why the "necessity of t'he case" principle embodied in RAP 5.3(i) has been and should be applied sparingly.

¶52 Market's failure to timely appeal precludes granting relief to Market from the order of October 28, 2005. System and the courts are entitled to rely on the finality of the judgment dismissing Market's cross-claim for indemnity from System.

¶53 The order granting summary judgment to System against Genie is reversed. System's motion to strike the joinder of Market in Genie's brief is granted.

BAKER and AGID, JJ., concur.

Reconsideration denied July 9, 2007.